**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-5 (ABJ)** |
| **MARK JEFFERSON LEFFINGWELL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mark Leffingwell to 27 months' incarceration, three years of supervised release, $2,000 in restitution, and a mandatory $100 special assessment.

### I.     INTRODUCTION

The defendant, Mark Leffingwell a 52-year-old resident of Seattle, Washington who is on disability due to a combat injury, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Leffingwell, a military veteran who once defended the Constitution from all enemies, foreign and domestic, willingly betrayed his nation and became an enemy of the United States on January 6. He flew across the country from his home in Seattle and made his way to the District of Columbia, where he, like thousands of others, marched on the Capitol. He made it as far as the

entrance to the Senate Wing where lawmakers and their staffers were secreted away from their own workplace, fleeing the violence and destruction wrought by the rioters.

By the time Leffingwell made it to the Senate Wing entrance, U.S. Capitol Police Officers and Metropolitan Police Department Officers had formed a protective line to prevent further entry into the Capitol. Before Leffingwell made his way to the breach, that same entrance had been overrun by rioters who streamed through the Capitol, looting, vandalizing, and otherwise terrorizing a temple of American democracy. But Leffingwell was not content to merely stand inside the threshold. Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol.[1] When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!"[2] When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head.[3] Before Leffingwell could escape back into the crowd, he was apprehended.

The government recommends that the Court sentence Leffingwell to 27 months' incarceration, which is within the advisory Guidelines' range of 24-30 months, which the government submits is the correct Guidelines calculation. A 27-month sentence reflects the gravity of Leffingwell's conduct, but also acknowledges his relatively early admission of guilt, the significant injuries he incurred while serving our country, and lack of criminal history.

---

[1] *See* Exhibit 3 (Annotated Metropolitan Police Department body-worn camera clip).
[2] *Id.*
[3] *See* Exhibits 1 and 2 (U.S. Capitol Police surveillance video and annotated U.S. Capitol Police surveillance video, respectively).

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Leffingwell among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Leffingwell's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings

underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; Draft PSR ¶¶ 12-18.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what

4

we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic

lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

Leffingwell flew from his home in Seattle, Washington to Philadelphia, Pennsylvania, where he met up with a friend before driving down to Washington, D.C. for the events of January 6. By his account, Leffingwell came to the District on January 6 to show support for former President Trump, and to join what he hoped would be a large presence at the rally that would bring into question the results of the election. As the rally ended and the crowd made its way to the Capitol, Leffingwell and his friend stopped to get lunch before eventually rejoining the crowd in front of the Capitol, which, at that point, had already been assaulted by the first wave of several hundred violent rioters.



*Figure 1: Lower West Terrace when Defendant Leffingwell ascended*

Instead of turning around or simply staying back after seeing the chaos and destruction before him, Leffingwell pressed forward onto the restricted Capitol grounds and up onto the Upper West Terrace, making his way to the Senate Wing entrance that had been attacked nearly two hours before Leffingwell arrived. By that point, a small, combined force of United States Capitol and Metropolitan Police Officers had reformed a line to rebuff additional rioters from gaining entrance to the Senate Wing of the Capitol. Leffingwell was positioned directly in front of the regrouped line of officers.



*Figure 2: Senate Wing Doors with Leffingwell at the front of the crowd*

As he stood at the front of the crowd of rioters behind him, Leffingwell chanted not only "stop the steal!" but also "shame!" and "join us!" directed at the police officers standing in front of him.



*Figure 3: Leffingwell chanting at the Senate Wing Doors*

Appearing to respond to the pleas of the line of officers, some of the crowd began to call back to the rioters behind them to "back up!" Rather than back up, Leffingwell called out for the rioters to stand their ground, shouting "If you back up, you'll never get back in!"[4] At that point, the line of officers began pressing on the crowd, including Leffingwell, to back them out of the threshold of the Senate Wing doors. Leffingwell had a choice: either comply with the direction of the officers or fight back. He chose the latter. He first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more.[5]

---

[4] *See* Exhibit 3 beginning at approximately 54 seconds.
[5] *See* Exhibit 2 at beginning at approximately 1 minute 30 seconds.



*Figure 4: Leffingwell punching Officer D.A.*

After he struck the two officers, Leffingwell tried to back out of the doors and into the safety of the sympathetic crowd behind him, but he was apprehended and taken to the ground. He was then escorted by Capitol Police Officers to another part of the Capitol building where he was arrested on scene.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 11, 2021, a federal grand jury returned an indictment charging Leffingwell with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), two counts of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering and Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly

Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On April 9, 2021, a federal grand jury returned a superseding indictment amending some of the language of the original indictment and adding one count of Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4).

On October 26, 2021, Leffingwell pled guilty to Count Two, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

## IV.    STATUTORY PENALTIES

Leffingwell now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the U.S. Probation Office, Leffingwell faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Assaulting, Resisting, or Impeding Certain Officers.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR incorrectly calculates the Guidelines range for this case.[6] *See* Draft PSR ¶¶ 25-35, 73. The assault charged and pled guilty to in Count Two qualifies as an "Aggravated Assault" under U.S.S.G § 2A2.4(c). As a result, the appropriate guideline for Count Two is § 2A2.2, rather than § 2A2.4. Section 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct, not simply the conduct underlying the crime for which Leffingwell was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). The Guidelines define aggravated assault as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.

A three-step analysis demonstrates that the cross-reference in § 2A2.4(c) applies here. First, Leffingwell's conduct that violated 18 U.S.C. § 111 as charged in Count Two was an assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.")

---

[6] As of the filing of this Memorandum, the Final Presentence Report has not yet been submitted by U.S. Probation. The government has raised the objections in this Memorandum with U.S. Probation.

(citations omitted). Here, Leffingwell struck two U.S. Capitol Police Officers. That conduct reflected a "willful attempt to inflict injury upon" the officers.

Second, the assault charged in Count Two is a "felonious assault" under 18 U.S.C. § 111 for two reasons. It involved physical contact. *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where assault involves physical contact with the victim of that assault). It also involved "an intent to commit another felony" because the assault occurred during the commission of another felony offense, namely, 18 U.S.C. § 231(a)(3) (Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder), which was charged in Count 1 of the Indictment. *See* 18 U.S.C. § 111(a) (mandating imprisonment of up to eight years where the assault involves the intent to commit another felony).

Finally, the "felonious assault" here qualified as an "aggravated assault" as defined in U.S.S.G. § 2A2.2 cmt. n.1. As noted above, an aggravated assault in the Guidelines is a "felonious assault" that involved . . . an intent to commit another felony." *Id.* Here, the felonious assault in 18 U.S.C. § 111(a) involved the intent to commit the civil disorder felony violation (18 U.S.C. § 231(a)(3)) described in the preceding paragraph and charged as Count 1.

Accordingly, we submit that the appropriate offense level computation for Count 2 is:

**Count 2: 18 U.S.C. § 111(a)(1)**

| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of Responsibility | <u>-3</u> |
| | **Total** | **17** |

The U.S. Probation Office calculated Leffingwell's criminal history as category I, which is not disputed. Draft PSR ¶ 39. Accordingly, based on the government's calculation of

Leffingwell's total adjusted offense level, after acceptance of responsibility, at 17, his Guidelines imprisonment range is 24 to 30 months' imprisonment. His plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a 27-month term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person like Leffingwell entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence,

they likely would have observed other extensive fighting with law enforcement.

While looking at Leffingwell's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this Leffingwell's crimes weigh towards a term of incarceration. Upon approaching the Capitol and seeing the havoc wrought on it by the violent mob after more than two hours of rioting, Leffingwell charged into the fray, up the Northwest Scaffolding, across the Upper West Terrace, and directly to the Senate Wing doors of the building. To his left and right, windows had been smashed out by rioters who went before him and he was met by a line of law enforcement officers attempting to clear the building after battling the mob, in some cases, for nearly three hours.

Frustrated that he could go no further, Leffingwell and his fellow rioters shouted at the officers who were carrying out their duties. And when there was a moment of clarity by a few in the crowd to heed the officers and back away, Leffingwell decried the move, demonstrating his

14

intention to stand his ground—he was on a mission and these officers were in the way. When they started to push him back from the Senate Wing, Leffingwell did what he could to fight them. Though his first punch met riot gear, he was undeterred, and kept punching until he was eventually pacified.

Pursuant to the terms of his plea agreement, Leffingwell engaged in a debrief with the U.S. Attorney's Office and the U.S. Capitol Police prior to his plea. During his interview, Leffingwell expressed some remorse, and that he felt "embarrassed" and "stupid" about his conduct on January 6. He expressed that if given the opportunity he would formally apologize to the victim officers.

Officers D.A. and W.H. do not wish to provide formal victim impact statements, but they wished to convey to the Court that they hope Leffingwell receives and serves a just sentence and repays his debt to society for his conduct on January 6.

### B. The History and Characteristics of the Defendant

Leffingwell lacks any scorable criminal history, which weighs in favor of a less severe sentence. *See* Draft PSR ¶¶ 36-42. According to documentation provided both to the U.S. Probation Office and to the government, Leffingwell also has certain medical conditions, particularly some neurological conditions that were exacerbated by an attack while he was serving with the Army National Guard in Iraq in 2008. *See* Draft PSR ¶¶ 50-57. This is mitigating, in that Leffingwell was wounded in service to the country and should be both credited and commended. However, granting that the medical conditions resulting from that injury affect some of Leffingwell's daily life, like maintaining steady employment, all of these medical conditions predated his decision to fly across the country, travel to Washington, D.C., attend a rally, march to the Capitol, and make his way inside the Capitol, where he willingly pushed against a police

line, and then punched two separate Capitol Police Officers. The government is not unsympathetic to difficulties Leffingwell may have as a result of his conditions, but nothing suggests that those conditions accounted for any of his conduct on January 6.

While Leffingwell should be credited for his military service, it is also a troubling aspect of his history and characteristics when applied to this case. *See* Draft PSR ¶ 66. Leffingwell's actions on January 6 were fundamentality antithetical to his military career, where he served first as a Marine and then as a National Guardsman, where he was wounded on duty. More than the average citizen, Leffingwell knew that allegiance to the United States of America takes precedent over allegiance to any political party or any one person. When he donned his military uniforms with American flag patches in hostile territory, he used the training he had received to serve as a defender of the whole United States, not just of people belonging to one ideology or who just aligned with his way of thinking. To assault the United States Capitol, a beacon of democracy for all Americans, is a shameful dereliction of duty to the country he has served. So, while his lack of any criminal history weighs against a term of incarceration, his other characteristics, namely his military service, neutralize the benefit of a lack of criminal history under 18 U.S.C. § 3553(a).

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense,

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at

this factor supports a sentence of incarceration. Leffingwell's criminal conduct, assaulting law enforcement officers during an assault of the Capitol is the epitome of disrespect for the law. By the time Leffingwell entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

[8] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. First, Leffingwell's military training, which would normally function to his credit at sentencing, raises concern given his decision was to march on the Capitol as lawmakers and staffers from both parties were performing their duties on behalf of

the American people. Second, although Leffingwell has now expressed remorse for what he has called a "stupid" decision to assault the law enforcement officers, cries for action based on the 2020 Presidential election continue to this day,[9] and a sentence to a term of incarceration would serve as a specific deterrent from Leffingwell engaging in any further acts of violence inspired by this rhetoric.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the

---

[9] *See e.g.* https://www.businessinsider.com/steve-bannon-claims-trump-rally-overturn-2020-election-florence-arizona-2022-1. (Last accessed January 23, 2021).

19

> Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases.

As of the date of this sentencing memorandum, only four felony Capitol Riot defendants

have been sentenced for violations of Section 111(a)(1), though all four were also sentenced for violations of Section 111(b), the enhanced version of the assault on a federal officer statute. In *United States v. Scott Fairlamb*, 21-cr-120 (RCL), Fairlamb entered the Senate Wing armed with a police baton and later punched a police officer in the face on the Upper West Terrace, similar conduct to Leffingwell. Fairlamb also pled guilty to violating Section 1512(c) for obstructing the official proceedings taking place in the Capitol. In that case, the government recommended a 44-month sentence, which was the midpoint for his Guidelines range, and Fairlamb was sentenced to 41 months' imprisonment, the bottom of his Guidelines range.

In *United States v. Robert Palmer*, 21-cr-328 (TSC), Palmer repeatedly assaulted police with a wooden plank and then sprayed officers with a fire extinguisher, which he later threw at them, while on the Lower West Terrace of the Capitol. Palmer's conduct after January 6 disqualified him from the reduction for acceptance of responsibility under § 3E1.1. In that case, the government requested a sentence of 63 months' imprisonment, at the bottom of the Guidelines for that defendant, which the Court imposed.

In *United States v. Devlyn Thompson*, 21-cr-461 (RCL), Thompson assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a police line, and stayed in the area of some of the most vicious assaults for multiple hours. The government requested a sentence of 48 months' imprisonment, near the bottom of the defendant's Guideline range. The Court imposed a sentence of 46 months' imprisonment, at the bottom of the Guidelines.

Most recently, in *United States v. Nicholas Languerand*, 21-cr-353 (JDB), Languerand observed violence at the Capitol for two hours before joining in with other rioters to assault police officers on the Lower West Terrace. Languerand threw sticks and a traffic bollard at police officers

and eventually used a riot shield against the officers. The government requested a sentence of 51 months, at the midpoint of the defendant's guideline range. The Court imposed a sentenced of 44 months' imprisonment, two months below the bottom the Guidelines, noting the defendant's acknowledgement that his violent conduct on January 6 was wrong and his unusually difficult childhood marked by, among several notable traumas, his father's imprisonment for setting the trailer Languerand lived in with his mother on fire.

Because Leffingwell was not armed when he assaulted the police officers and did not inflict serious bodily injury, he is not being prosecuted under 18 U.S.C. § 111(b), and his Guidelines range is lower than these other felony defendants. But Leffingwell did in fact use violence to assault two officers, and he did so while inside the Capitol. A sentence of 27 months' imprisonment—in the middle of the applicable 24–30 month Guidelines range—would not create an unwarranted sentencing disparity between Leffingwell's case and any other similar case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers D.A. and W.H., did not suffer bodily injury as a result of Leffingwell's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Leffingwell must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Leffingwell played in the riot on January 6.[11] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Leffingwell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* Draft PSR ¶¶ 88-89.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 27 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, three years of supervised release, $2,000 in restitution, and a mandatory $100 special assessment.

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     _/s/Christopher A. Berridge_____
        Christopher A. Berridge
        GA Bar No. 829103
        Jennifer M. Rozzoni
        NM Bar No. 14703
        Assistant United States Attorneys
        555 Fourth Street, N.W.
        Washington, D.C. 20530
        (202) 252-6685
        Christopher.Berridge@usdoj.gov
        (505) 350-6818
        Jennifer.Rozzoni@usdoj.gov

24