IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cr. No. 21-005 ABJ |
| | ) |
| Mark Leffingwell | ) |
| | ) |

*****

**MEMORANDUM IN AID OF SENTENCING**

Mark Leffingwell, by his attorney, Mark J. Carroll, hereby submits the following memorandum in aid of sentencing in this matter. Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in Rita v. United States, 127 S. Ct. 2456 (2007), Kimbrough v.United States, 128 S. Ct. 558 (2007), Gall v. United States, 128 Ct. 586 (2007) and Nelson v.United States, 555 U.S. 338 (2009), Mr. Leffingwell respectfully requests the Court to impose a sentence of probation and community service with conditions to treat his mental health issues. Mr. Leffingwell submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553. Sentencing is currently scheduled for February 10, 2022, at 2:00 p.m., via video, before the Honorable Amy Berman-Jackson. In support of this request, counsel states:

## FACTUAL BACKGROUND

Mr. Leffingwell was arrested on the subject matter in this case and made his initial appearance on January 7, 2021, before the Honorable Magistrate Judge, G. Michael Harvey. He had his pretrial detention hearing on January 8, 2021, where he was released on his personal recognizance with an order to report weekly to the Probation Department in the District of Columbia.

On April 9, 2021, the defendant was charged in a seven-count Superseding Indictment with: Count One (Civil Disorder) pursuant to 18 U.S.C. § 231(a)(3); Count Two (Assaulting, Resisting, or Impeding Certain Officers or Employees) pursuant to 18 U.S.C. §§ 111(a)(l); Count Three (Assaulting, Resisting, or Impeding Certain Officers or Employees) pursuant to 18 U.S.C. §§ 111(a)(l); Count Four (Entering and Remaining in a Restricted Building) pursuant to 18 U.S.C. § 1752(a)(l); Count Five (Disorderly and Disruptive Conduct in a Restricted Building) pursuant to 18 U.S.C. § 1752(a)(2); Count Six (Violent Entry and Disorderly Conduct in a Capitol Building) pursuant to 40 U.S.C. § 5104(e)(2)(D); Count Seven (Act of Physical Violence in a Capitol Building) pursuant to 40 U.S.C. § 5104(e)(2)(F).

In accordance with the Government's policy, Mr. Leffingwell had to be debriefed before he would receive a plea offer. He debriefed via video on the earliest possible date, August 13, 2021.

On October 26, 2021, the earliest possible date, the defendant appeared via video, in the United States District Court in the District of Columbia, before the Honorable Amy Berman-Jackson, United States District Judge, and pled guilty to Count Two, Assaulting, Resisting, or Impeding Certain Officers or Employees) pursuant to 18 U.S.C. §§ 111(a)(l). Mr. Leffingwell also agreed to pay $2000 in restitution.

Under the terms of the plea discussions, the parties agree that Mr. Leffingwell's Base Offense Level would be 14 pursuant to §2A2.2 , (application note 1, Aggravated assault" means a felonious

assault that involved (D) an intent to commit another felony)[1] of the U.S.S.G. He would receive a 6 Level Official Victim enhancement pursuant to § 3A1.2. For acceptance of responsibility, he would receive a 3 Level reduction pursuant to § 3E1.1 (a&b). His adjusted offense level would be 17 with an estimated Criminal History Category of 1 as he has zero criminal history points. Mr. Leffingwell's estimated Guideline Range sentence is 24 to 30 months.

## ARGUMENT

Notwithstanding the agreements stated in the plea agreement, it should be noted, however, that the Guidelines are not mandatory, but merely advisory. The factors identified in 18 U.S.C. § 3553(a) support Mr. Leffingwell's request that he be sentenced below the applicable guideline range or statutory sentence. The Court must consider the Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

A district court should begin by correctly calculating the applicable Guidelines range. The Guidelines are the starting point and initial benchmark but are not the only consideration. After permitting both parties to argue for a particular sentence, the judge should consider all of 18 U. S. C. §3353(a)'s factors to determine whether they support either party's proposal. She may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented. If she decides on an outside-the-Guidelines sentence, she must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variation. She must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

---

[1] In the PSR, the writer found the Adjusted Offense level to be a Level 16 ( paragraphs 25-35 of the PSR). We will defer to the Court in this matter as the parties in the plea agreement agreed to an adjusted level of Level 17.

Page 3

In reviewing the sentence, the appellate court must first ensure that the district court made no significant procedural errors and then consider the sentence's substantive reasonableness under an abuse-of-discretion standard, taking into account the totality of the circumstances, including the extent of a variance from the Guidelines range, but must give due deference to the district court's decision that the §3553(a) factors justify the variance. United States v. Gall, 128 S. Ct. 586 (2007). (citing United States v. Booker, 543 U.S. 220, 260 (2005)). These factors include: "The nature and circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and . . . the need to provide restitution to any victims of the offense." 18 U.S.C. 3553(a). Pursuant to 18 U.S.C. § 3661, No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence. After considering all of the factors set forth in § 3553(a), the Court must impose a sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." Id. at 765 (citing 18 U.S.C. § 3553(a)(2)). Section 3582 of Title 18 provides: [t]he Court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.** (Emphasis added).

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set

forth in paragraph [(a)](2) [of § 3553]." 18 U.S.C. § 3553(a). As the Supreme Court recently confirmed, courts are "no longer . . . tied to the sentencing range indicated in the Guidelines." Cunningham v. California, 127 S. Ct. 856, 867 (2007). Instead, courts are "obliged to 'take account of' that range along with the sentencing goals Congress enumerated in the [Sentencing Reform Act] at 18 U.S.C. § 3553(a)." Id. (quoting Booker, 543 U.S. at 259, 264); see also United States v. Pickett, 475 F.3d 1347, 1351 (D.C. Cir. 2007) ("The Court's remedial opinion [in Booker] required the district court to treat the Guidelines as advisory only and as simply one factor to be considered in sentencing."). A review of all of the applicable factors set forth in § 3553(a) demonstrates that a sentence below the applicable guidelines would be warranted in this matter, and that a sentence of imprisonment within the Guideline range or the statutory maximum would be greater than necessary to meet the sentencing purposes set forth in § 3553(a).

**Factors of Mr. Leffingwell that the Court Should Consider under § 3553(a)(1)**

A. *Nature of the Offense*

While Mr. Leffingwell committed a very serious crime, he has expressed extreme regret and remorse for his actions. Mr. Leffingwell agreed to waive his right to file any pre-trial motions and pleaded guilty in a timely fashion - thereby saving scarce judicial resources.

B. *Characteristics of the Defendant*

As set forth in the PSR, Mr. Leffingwell is a 52-year-old, permanently disabled, U.S. Veteran. He has been married to his wife, Julie, for twenty-one years. They have two sons, Noah, age 15 and in the tenth grade and Nicholas, 14 in the eighth grade. After the Marine Corp., Mr. Leffingwell graduated from the University of Washington with a bachelor's degree in Sociology in 1995.

Mr. Leffingwell proudly served with the U.S. Marine Corp., from 1988 to 1991. He was stationed in Okinawa and received an Honorable Discharge.

After the United States was attacked on September 11, 2001, Mr. Leffingwell joined the Army National Guard in 2004. From August of 2008, until September of 2009, Mr. Leffingwell was deployed to Mosul, Iraq, as a convoy security specialist.

While in the Army, Mr. Leffingwell received the following commendations:

Army Commendation Medal
Army Achievement Medal
National Defense Service Medal ( second award)
Global War on Terrorism Service Medal
Iraq Campaign Service Medal with Campaign Star
Army Service Ribbon
Over Seas Service Ribbon
Armed Forces Reserve Medal with Military Device
Combat Action Badge

---

[2] Medical records of Mr. Leffingwell will be attached as a supplement to this memorandum. Letters in support of Mr. Leffingwell will also be attached.

Mark does not belong to any right wing extremist group, and he does not follow them on social media. He has never had an Instagram, twitter, or snapchat account. A friend helped him create a Facebook account many years ago that he never really used and had only posted on it once. He deleted it after the January 6th incident. He really doesn't like social media at all. He only uses email through a family account where his wife does 99% of the corresponding.

Mark's trip to Washington D.C. was his first time going to any sort of organized protest event. He has never been a part of any other protest or arrested in conjunction with any sort of protest. He has never visited any other state capitols. His decision to come to Washington, D.C., on January 6, 2021, was a last minute decision. His friend, Jake Sudderth, bought him a plane ticket to Philadelphia on January 3rd. Jake did this with his bonus miles. Mark and Jake drove down from Philadelphia on the morning of January 6th to hear former President Trump speak.

After the speech, they went and had lunch at, Fogo De Chao, 1101 Pennsylvania Ave, N.W. While eating lunch at the restaurant they were watching on television the events unfolding at the Capitol. They left there at approximately 3:00 p.m. and decided to walk up to the Capitol and see what was going on. They walked into the Capitol at approximately 4:00 p.m. and walked in through the Senate side. Once inside the Capitol, the two of them got separated. The breech of the Capitol had taken place at 2 p.m.

Not to downplay the seriousness of what Mark, but a review of the governments video shows his conduct not to be so sinister as portrayed by the indictment. .Mark stood peacefully in a doorway entrance for a period of time. The video shows that he is surrounded by police officers with no conflict taking place. It appears that the officers had decided that it was time to clear the area. Without warning, they pushed Mark backward. Out of human nature and instinctively, he threw three punches. Two of the

punches were directed at the same officer. Both officers were in full riot gear and neither one of them were hurt. Mark was put on the ground immediately, handcuffed and arrested.

Mark was brought to the U.S. Capitol Police, Central Cell Block on First Street, N.E. The two officers approached Mark when he was handcuffed to a bench. They asked Mark if he remembered them, to which he answered no. They had on face shields and helmets during their earlier encounter. They told him that they were the guys that he had just punched. Mark apologized immediately. Having been a soldier that had defended our country, he felt ashamed about what he had done. Mark had never been in trouble in his life and could not believe that he had put himself in harm's way like this. He accepts full responsibility for actions and wished that this had never happened. He has two young boys, and he feels that he let them and his wife Julie down.

Counsel for Mr. Leffingwell is a retired Assistant U.S. Attorney. It is his belief that had this offense taken place under different circumstances, Mark would have been given a misdemeanor plea offer or the case might have even been *no-papered*.

## Defendant's Sentencing Proposal

Based on all of the foregoing reasons, Mr. Leffingwell now respectfully requests the Court to impose of a period of probation with community service. He has been living at home and working in Seattle. He has had no violations of his pretrial release conditions. Counsel for Mr. Leffingwell understands that this sentencing proposal request for Mr. Leffingwell is unusual considering his Guideline exposure.

In the event that the Court is not inclined to give Mr. Leffingwell probation, we would ask that the Court not give him a sentence greater than 60 days.

Because Mark is a fully disabled veteran, he faces these consequences:

### Disability Compensation

VA disability compensation payments are reduced if a Veteran is convicted of a felony and imprisoned for more than 60 days. Veterans rated 20 percent or more are limited to the 10 percent disability rate. For a Veteran whose disability rating is 10 percent, the payment is reduced by one-half. Once a Veteran is released from prison, compensation payments *may* be reinstated based upon the severity of the service connected disability(ies) at that time. Payments are not reduced for recipients participating in work release programs, residing in halfway houses (also known as "residential re-entry centers"), or under community control. The amount of any increased compensation awarded to an incarcerated Veteran that results from other than a statutory rate increase may be subject to reduction due to incarceration.

### Pension

Veterans in receipt of VA pension will have payments terminated effective the 61st day after imprisonment in a Federal, State, or local penal institution for conviction of a felony or misdemeanor. Payments may be resumed upon release from prison if the Veteran meets VA eligibility requirements. Failure to notify VA of a Veteran's incarceration could result in the loss of all financial benefits until the overpayment is recovered.

https://www.benefits.va.gov/persona/veteran-incarcerated.asp

Mark has a wife, two sons and a house with a mortgage. He works at menial jobs when work is available. His wife was working at a casualty insurance agency but due to Covid has not had any work available for six months now. Additionally, her employer was uncomfortable with the charges brought against Mark. It is counsel's belief that in today's climate, Mark would never get his disability pension back when he now, needs it the most.

We would also ask the Court to use its discretion and fashion a sentence which takes into account the hoped for downward departure pursuant to 18 USC § 3553(a) and the opportunities permitted in "Zone C" of the U.S.S.G. § 5C1.1 (d&e).

U.S.S.G. § 5C1.1 (d&e) authorizes:

(d) If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by --

(1) a sentence of imprisonment; or

(2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

(e) Schedule of Substitute Punishments:

(1) One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for any calendar day during which the defendant is employed in the community and confined during all remaining hours);

(2) One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment;

(3) One day of home detention for one day of imprisonment.

This particular U.S.S.G. section (§ 5C1.1(e)) is typically called the "one for one" sentence, which means that for each day of imprisonment, a defendant is required to serve a corresponding day of either community confinement or home detention, with work release privileges. This is the type of sentence Mr. Leffingwell would be requesting so that he could continue to work and support his family.

As noted in the Presentence Report, Mr. Leffingwell has zero criminal history points. The Sentencing Commission has found that **less than 5 percent** of defendants like Mr. Leffingwell who fall into Criminal History Category I sustain a new conviction within two years of release. See U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines Ex.3 (May 2004), *available at* www.ussc.gov/publicat/Recidivism_General.pdf. Thus, Mr. Leffingwell is unlikely to recidivate.

In determining whether to incarcerate Mr. Leffingwell, the Court shall consider, among other factors, that his age also substantially decreases his likelihood of recidivism. Mr. Leffingwell will be 52 years old at sentencing. "Recidivism rates decline relatively consistently as age increases." the likelihood of recidivism. See U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines Ex.3 (May 2004), *available at* www.ussc.gov/publicat/Recidivism_General.pdf. At 12. Thus, again, Mr. Leffingwell is unlikely to recidivate.

The Sentencing Commission has found that "[a]mong all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent." Id. Given Mr. Leffingwell's record of success on pretrial release, a sentence as proposed here is "sufficient but not greater than necessary" to provide a specific deterrent in this case.

In determining whether to incarcerate Mr. Leffingwell, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The recent advisory from the Administrative Office of the United States Courts suggests that the Court use an annual cost of $44,256 for imprisonment, an annual cost of $35,760 for community confinement, and an annual cost

of $4,452 for supervision.

In the event the Court remands Mr. Leffingwell to the Bureau of Prisons, Mr. Leffingwell requests that the Court limit any restitution demands against his commissary account to $20 per month. Pursuant to the Inmate Financial Responsibility Program within the Bureau of Prisons, If you are fortunate enough to get a job with the BOP, they will take up to $75 a month from your commissary account.

If a United States District Judge does not impose a cap on a defendant's restitution payments, the financial plan imposed by the facility can be *Draconian*. This is not to say that Mr. Leffingwell would not participate, but if he is unable to, life inside can be miserable. His family may or may not be able to put money on his commissary account and with his diminished cognitive skills, again he may or may not be able to get a job in prison. These are some, but not all of the punitive measures that can be taken against him:

> d. Effects of Non-participation. Refusal by an inmate to participate in the financial responsibility program or to comply with the provisions of his financial plan ordinarily shall result in the following:
> (1) Where applicable, the Parole Commission will be notified of the inmate's failure to participate;
> (2) The inmate will not receive any furlough (other than possibly an emergency or medical furlough);] This restriction does not apply to inmates requiring medical furloughs and inmates with "OUT" or "COM" custody who are transferring from one institution to a minimum security level institution via an unescorted transfer. P5380.08 8/15/2005 Page 12
> (3) The inmate will not receive performance pay above the maintenance pay level, or bonus pay, or vacation pay; The Unit Team is to consider institution needs, particularly for skilled workers. Such needs may require that an inmate with a financial obligation be assigned to a lower paying, non-UNICOR work assignment. The Unit Team considers this when developing the inmate's financial plan. An inmate working above the maintenance pay level who fails to make satisfactory progress on his or her payment plan is to be reduced to maintenance pay.
> (4) The inmate will not be assigned to any work detail outside the secure perimeter of the facility; Additionally, inmates will not be permitted to participate in activities outside the secure perimeter, such as speaking engagements.

(5) The inmate will not be placed in UNICOR. Any inmate assigned to UNICOR who fails to make adequate progress on his/her financial plan will be removed from UNICOR, and once removed, may not be placed on a UNICOR waiting list for six months. Any exceptions to this require approval of the Warden; The Unit Team may recommend an inmate for priority placement in UNICOR to assist in paying a significant financial obligation. Ordinarily, an inmate will not be recommended for priority placement unless he or she has obligations totaling at least $1,000 and limited outside resources.

(6) The inmate shall be subject to a monthly commissary spending limitation more stringent than the monthly commissary spending limitation set for all inmates. This more stringent commissary spending limitation for IFRP refuses shall be at least $25 per month, excluding purchases of stamps, telephone credits,..

(7) The inmate will be quartered in the lowest housing status (dormitory, double bunking, etc.);

(8) **The inmate will not be placed in a community-based program;**] The Unit Team is to consider the inmate's participation in the IFRP as an important factor when determining Community Corrections Center (CCC) placement. [i.e., a Halfway house]

(9) …Incentives are defined as early release, financial awards, maximum CCC placement consideration, and local institution incentives.

https://www.bop.gov/policy/progstat/5380_008.pdf

## CONCLUSION

WHEREFORE, in light of all of the arguments presented and such other reasons that may be discussed at the sentencing hearing in this matter, Mr. Leffingwell respectfully submits sentencing him to a term of imprisonment not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide Mr. Leffingwell with needed educational or vocational training and medical care." See 18 U.S.C. § 3553(a).

Mr. Leffingwell further prays of this Court that if he is to be incarcerated to recommend to the Bureau of Prisons that he be incarcerated at F.D.C. Sea Tac, Seattle, Washington. and that he be allowed to self-report.

Respectfully submitted,

/s/
_____

Mark J. Carroll, Esquire #414-619
39641 Tern Road
Bethany Beach, DE 39641-3475
443-421-3475 (cell)
markjcarroll@hotmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that all counsel of record have been served via the ECF, email or fax this 26th day of January 2022.