IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              CR No. 1:21-cr-00005-ABJ-1

v.                                    Washington, D.C.
                                      Thursday, February 10, 2022
MARK J. LEFFINGWELL,                  2:00 p.m.
                    Defendant.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jennifer M. Rozzoni, Esq.
                          DOJ-USAO
                          Lrm Lee, Edmund
                          201 3rd Street, NW
                          Suite 900
                          P.O. Box 607
                          Albuquerque, NM 87102
                          (505) 224-1460

                          James Pearce, Esq.
                          U.S. DEPARTMENT OF JUSTICE
                          CRIMINAL DIVISION APPELLATE SECTION
                          Department of Justice
                          Criminal Division
                          950 Pennsylvania Avenue, NW
                          Suite 1250
                          Washington, DC 20530
                          (202) 532-4991

For the Defendant:        Mark J. Carroll, Esq.
                          MARK JOHN CARROLL ESQ., P.C.
                          39641 Tern Road
                          Bethany Beach, DE 19930
                          (443) 421-3475

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111

1                        **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  The U.S. District Court for the

3       District of Columbia is now in session.  The Honorable Amy

4       Berman Jackson presiding.

5              Your Honor, this afternoon, this is scheduled for

6       a video sentencing.  We have Criminal Case No. 21-5, the

7       United States of America v. Mark Jefferson Leffingwell.

8              Will the probation officer please identify herself

9       for the record.

10              THE PROBATION OFFICER:  Good afternoon, Your

11       Honor.  Carmen Newton for the Probation Office.

12              THE COURT:  Good afternoon.

13              THE DEPUTY CLERK:  Will counsel for the

14       Government, starting with counsel from New Mexico, please

15       identify themselves for the record.

16              MS. ROZZONI:  Yes.  Good afternoon, Your Honor.

17       Jennifer Rozzoni and John Pearce on behalf of the United

18       States.

19              THE COURT:  Good afternoon.

20              THE DEPUTY CLERK:  Counsel for the defendant,

21       please identify yourself for the record.

22              MR. CARROLL:  Good afternoon, Your Honor.  Mark

23       Carroll on behalf of Mr. Leffingwell, who is in Seattle,

24       Washington, and he has agreed to appear by video for this

25       hearing, Your Honor.

```
1              THE COURT:  All right.  Thank you.

2              THE DEPUTY CLERK:  Could Mr. Leffingwell please

3    state and put his name on the record and verify that he is

4    able to both see and hear the judge and the attorneys in

5    this case.

6              THE DEFENDANT:  Good afternoon, Your Honor.  Mark

7    Leffingwell.  And I see everyone -- all of the attorneys in

8    the case on my screen.

9              THE COURT:  All right.  Good afternoon,

10   Mr. Leffingwell.

11             And I know that this was put in writing in the

12   plea agreement, but I just want to make sure.  Mr. Carroll,

13   you've discussed with the defendant the fact that he has the

14   right to be here in person for his sentencing and whether he

15   wishes to proceed by videoconference?

16             MR. CARROLL:  Yes, I have, Your Honor.  He does

17   wish to proceed by video in light that he's 3,000 miles away

18   and the costs would be prohibitive and he would have to wear

19   a mask for six hours in each direction.

20             THE COURT:  All right.  And given the costs, and

21   also, the risks of traveling here during this time,

22   Mr. Leffingwell, do you, in fact, agree to proceed by video

23   this afternoon?

24             THE DEFENDANT:  I do, Your Honor.

25             THE COURT:  Okay.  And I find under the court's
```

 1    standing orders and the CARES Act that given your consent,

 2    the fact that the court is closed to in-person proceedings

 3    as much as possible to protect the health and safety of the

 4    participants as well as court personnel, and the risks

 5    involved in travel and the length of time this case has been

 6    pending, that the sentencing in this case cannot be further

 7    delayed without serious harm to the interests of justice and

 8    we will move forward by video.

 9              I also want to say that even though we are

10    proceeding by video, the public is permitted to listen in on

11    these proceedings by calling our phone line, and -- but I

12    want to remind everyone who is listening in by phone that

13    you are welcome to observe as you would be if we are here in

14    person but that our local rules prohibit recording and

15    disseminating recordings of court proceedings.

16              All right.  With all of that, Mr. Carroll, the

17    final presentence report was filed in this case on February

18    3rd, and there was a revised report docketed on February 7th

19    in response to my inquiries about the calculation of the

20    guidelines.  Have both you and Mr. Leffingwell reviewed the

21    presentence report?

22              MR. CARROLL:  Yes, we have, Your Honor, and he has

23    a --

24              THE COURT:  And --

25              MR. CARROLL:  -- full understanding of it.

```
1              THE COURT:  Okay.  And other than the issues about

2    the guidelines, which we're going to talk about later, I

3    don't believe there's any factual disputes that need to be

4    resolved.  Is that correct?

5              MR. CARROLL:  That is correct, Your Honor.

6              THE COURT:  Okay.  And I don't think there are any

7    legal disputes to be resolved either other than the

8    guideline question.

9              MR. CARROLL:  That is correct, Your Honor.

10             THE COURT:  All right.  Now, I've received and

11   reviewed all the versions of the presentence report and I've

12   also received additional materials concerning the defendant,

13   including the Government's memorandum in aid of sentencing

14   and its submission about the guidelines issues; the

15   defendant's memorandum in aid of sentencing with a number of

16   attachments, including some medical records that remain

17   sealed from approximately 2012 to 2013 and, I think, some

18   that go up to 2015 and '16; multiple letters from a number

19   of people.  I'm going to omit their names from the public

20   record, but I hope to provide enough information so that

21   each can be assured that I read what they had to say.

22             I read a letter from a neighbor who described the

23   defendant as an honest and good American who stresses his

24   bravery and patriotism, the fact that he was injured going

25   to war for our freedom, and emphasized how kind and helpful
```

1    the defendant is with household repairs, etcetera,

2    notwithstanding his disabilities and injuries.

3           I received a few letters from people who did not

4    appear to know much about the facts that were alleged but

5    wanted me to know that they found the charges surprising.

6           A family friend told me that the defendant is

7    thoughtful, polite, a hard worker who helps others

8    unselfishly but who's friendly and kind, notwithstanding

9    what happened when he was in the reserves.  She believes the

10   charges are uncharacteristic and that he must have gotten

11   caught up in the moment on January 6th.

12          Another individual who's known the defendant for

13   10 years, met when he helped him with some construction

14   projects, said his only problem was that he had some

15   short-term memory problems.  He has a hard time believing

16   that such a nice and gentle person would be involved in the

17   mob violence that occurred that day.

18          I heard from a couple whose children went to

19   school with the Leffingwells and became dear friends.  They

20   explained that they met him when he spoke at a -- at the

21   school at a Veterans Day assembly about his service and his

22   love of his country, and they said Mark's knowledge about

23   the history of America as well as the history of the world

24   make a conversation with Mark not only interesting but also

25   unforgettable, and they emphasized how much they love to

1   talk with him.

2           I received a letter from a friend who originally

3   met the defendant through work back in 1993.  He emphasized

4   the defendant's work ethic; the fact that he was supportive

5   of and helpful to others; and that after he returned from

6   Iraq, he has been a responsible husband and father and a

7   model to others.  He assists people in the community, is

8   respectful at church, and spends time listening to problems

9   among friends and family.  In short, he's a model citizen.

10          I do find it odd, though, and a little -- and,

11  maybe, more than a little bit troubling that this person,

12  who was the person who brought the defendant to the District

13  on January 3rd, said -- 6th, said absolutely nothing about

14  that or about his role in how or why the defendant came to

15  be here when he took the trouble to write me a letter.

16          I also received a letter from the defendant's

17  uncle, a university professor, who described the defendant

18  as an honest person, sincere, free of pretension or

19  calculation.  He's never misleading.  He opined that

20  injuries arising from his military service impact his

21  critical thinking and make him an easy target for the

22  misinformation in today's environment, but he emphasized

23  that it's forgetfulness and nothing more that affects his

24  ability to work.  And he did tell me -- and I appreciated

25  his acknowledgement of this -- that from where I sit, this

1    is a difficult and complex matter.

2            A neighbor and friend gave me a detailed picture

3    of the person who volunteers, does landscaping, shovels

4    snow, and goes out of his way to do construction projects to

5    help others.  He knows from private conversations how

6    defendant's memory loss can affect potential employment and

7    how difficult that's been to deal with and said he'd also

8    witnessed how differently the defendant responds one on one

9    compared to being in a crowd where he might get much more

10   uncomfortable and indeed got on edge one time when they were

11   at a concert and had to leave.

12           Another friend of the family emphasized the amount

13   of time the defendant has always devoted to assisting others

14   in the neighborhood.

15           A gentleman who's known him for over 40 years

16   reminded me how loyal he is to his country.  He posited that

17   the combination of the results of his service abroad and the

18   misinformation at the time may have led him to believe that

19   he was doing the right thing; that he recognizes his error

20   now.

21           Another close friend described him as a supportive

22   friend who helps others going through hard times, a joy to

23   be around with a friendly demeanor.

24           And finally, the defendant's brother wrote that he

25   was disgusted by the conduct but assures me that it's

1    contrary to the way they were raised, the ideals they've

2    always lived by.  He reminded me of the defendant's lifetime

3    of hard work, service to the country, and family.  In his

4    view, the offense was the result of the combination of his

5    disability and misguided patriotism which made him an easy

6    target.

7            I want everyone who took the trouble to write to

8    me to know that I read and considered and appreciated all of

9    the letters.

10           I also want to add, when I'm talking about

11   information that I relied on in connection with the

12   sentencing, that the defendant's sentencing memorandum made

13   reference to extreme remorse and regret that the defendant

14   had expressed.  So I asked the Government whether it could

15   corroborate or if it was going to dispute that, and it

16   provided me with a detailed summary of an interview

17   conducted in advance of the plea with the U.S. Attorney's

18   Office and the FBI in the presence of the defendant's

19   counsel and his wife.  It's Docket 38.  And the defendant

20   informed me in Docket 37 that it agreed with the summary of

21   the debriefing.

22           Now, in the plea agreement, the Government agreed

23   that information exchanged in the interview could not be

24   used for the purpose of determining the applicable guideline

25   level, but it could be used as otherwise permitted under the

1    guidelines.  And the guidelines say you need to look to

2    Federal Rule of Criminal Procedure 11 for how this kind of

3    information could be used.  And Federal Rule of Criminal

4    Procedure 11(f) provides that information provided in a plea

5    discussion is governed by Federal Rule of Evidence 410.  So

6    finally, you get to Federal Rule of Evidence 410(a)(4) and

7    it prohibits the use of statements made during plea

8    discussions with the U.S. Attorney's Office if those

9    discussions did not lead to a plea, and that's not

10   applicable here.  And in any event, Rule 410(b)(1) also

11   provides for an exception if other statements made during

12   that conversation have been introduced by the defendant.

13          So my question for you, Mr. Carroll, is, do you

14   agree that I can consider the agent's account in connection

15   with this proceeding?

16          MR. CARROLL:  Yes, I do agree with that.  You can

17   consider it, Your Honor.

18          THE COURT:  All right.  And I will do so and I

19   have done so.

20          So now, we're at the point where I have to

21   calculate what the sentencing guidelines would recommend as

22   a sentence in this case.

23          As I said at the time you pled guilty,

24   Mr. Leffingwell, there's a law that tells me how I'm

25   supposed to go about deciding what a sentence should be and

1     it lists a number of factors I'm supposed to think about,

2     and the advisory sentencing guidelines are one of the things

3     that I'm supposed to consider when I determine the sentence,

4     but I'm required to calculate what they would recommend in

5     every case, and I just want to assure you that's -- while

6     that's where I'm going to start, that's only one part of

7     what we're going to be talking about today.

8              The defendant pled guilty to assaulting,

9     resisting, or impeding a federal officer, in violation of 18

10    U.S. Code Section 111(a)(1) which provides for a maximum

11    sentence of up to eight years of imprisonment.  And there

12    seems to be, while we didn't start out this way, more than

13    one proposed guidelines calculation before the Court.  The

14    original presentence report prepared by the Probation Office

15    started with a base offense level under the guidelines of

16    Section 2A2.4 for obstructing and impeding officers, Level

17    10.  They then increased it under Section 2A2.4(b)(1)(A) by

18    three levels, given the presence of physical contact,

19    bringing us to Level 13.  And then they looked at Chapter 3

20    for victim-related adjustments and added six levels under

21    Section 3A1.2(c)(1) for an official victim and added six

22    more levels, bringing us to Level 19.  That adjustment says

23    if, in a manner creating substantial risk of serious bodily

24    injury, the defendant or a person for whose conduct the

25    defendant is otherwise accountable, knowing or having

1    reasonable cause to believe that a person was a law

2    enforcement officer, assaulted such officer during the

3    course of the offense or immediate flight therefrom, and you

4    add six levels for that reason, but the Probation Office

5    also reduced the calculation by three levels, given the

6    defendant's acceptance of responsibility.

7            Putting aside the question of whether we can say

8    that this offense was committed in a manner creating a

9    substantial risk of serious bodily injury, given the

10   entirety of the conduct revealed on the videos, this

11   enhancement, which had been incorporated by the parties in

12   their agreed calculation at the time of the plea, troubled

13   me.  There's a redundancy there as the base offense level

14   the Probation Office chose, Section 2A2.4, already

15   incorporates the notion that the victim was the law

16   enforcement officer.  So I looked into it further and

17   indeed, as the Probation Office now agrees, the application

18   note to this adjustment states, Do not apply this adjustment

19   if the offense guideline specifically incorporates this

20   factor.  And the only offense guideline in Chapter 2 that

21   specifically incorporates this factor is the one the

22   Probation Office started out with, 2A2.4 for obstructing or

23   impeding officers.

24           So if you take the approach recommended in the

25   revised presentence report and start at Section 2A2.4, as

1      the Probation Office suggested, and add the three levels for

2      physical contact, you'd subtract only two for acceptance of

3      responsibility and you'd end up at Level 11, and that's what

4      the defendant now says is the right thing to do, but we have

5      a plea agreement in this case and it did not start with the

6      base offense level set forth at Section 2A2.4, obstructing

7      or impeding officers, but Section 2A2.2, aggravated assault

8      with intent to commit another felony, which starts you out

9      at a Level 14.  Under the guidelines, aggravated assault is

10     defined as felonious assault that involved either (A), a

11     dangerous weapon with intent to cause bodily injury; (B),

12     serious bodily injury; (C), strangling, suffocating, or

13     attempting to strangle or suffocate; or (D), an intent to

14     commit another felony.  And the parties agreed that Section

15     (D) applied in the plea agreement.

16              I'm inclined to agree with the Probation Office's

17     inclination that it isn't obvious that this offense -- this

18     is what the guideline is all about, particularly since there

19     is a different assault guideline specifically directed at

20     impeding officers.  We clearly don't have any of the other

21     aggravating factors, but the guideline for obstructing and

22     impeding officers, Section 2A2.4, explicitly states in

23     Subsection (c)(1) that, quote, If the conduct constituted

24     aggravated assault, you are supposed to apply Section 2A2.2

25     instead.  The Probation Office took the position, anyway,

1    that we can't use that guideline as a matter of law.  It

2    said that when you look at the conduct under Section

3    2A2.4(c)(1), that only means the conduct of the offense for

4    which the defendant was convicted: here, actually throwing

5    the punches.

6            But the Government points out that in United

7    States v. Valdez-Torres, 108 F.3d 385 from the D.C. Circuit,

8    the Circuit that's binding on me held that the term

9    "conduct" in the cross-reference in Section 2A2.4 refers to

10   all relevant conduct, not simply the conduct underlying the

11   crime for which the defendant was convicted.  And according

12   to the guideline, "relevant conduct" is defined to be all

13   acts and omissions committed or willfully caused by the

14   defendant that occurred during the commission of the offense

15   of conviction, in preparation for that offense, or in the

16   course of attempting to avoid detection or responsibility

17   for that offense, and that's Section 1B1.3(a)(1)(A) of the

18   guidelines.

19           Mr. Leffingwell, I apologize to you and everybody

20   else who is trying to follow along for all of the technical,

21   mathematical calculations required by the sentencing

22   guidelines, but I didn't write them and, as I told you at

23   the beginning, I'm required by law to figure out how they

24   apply to you.

25           So the Government says, considering all of

1    Mr. Leffingwell's relevant conduct which included chanting

2    stop the steal, shame, and join us, and then proceeding to

3    punch two officers in order to prevent them from clearing

4    him from the building in the midst of widespread civil

5    disorder that engulfed the U.S. Capitol on the afternoon of

6    January 6th, this Court should conclude that the applicable

7    base offense level is Section 2A2.2, and it is an aggravated

8    assault as defined in the application notes to that

9    guideline.

10          So I have a question for you, I think, Mr. Pearce.

11   You're here to talk about the guidelines?

12          MR. PEARCE:  Yes, I am, Your Honor.

13          THE COURT:  Okay.  "Aggravated assault" means a

14   felonious assault that involved an intent to commit another

15   felony.  Now, the defendant pled guilty to a felony.  So

16   that made me want to ask, well, what is the other felony the

17   relevant conduct evinced an attempt to commit?  The original

18   sentencing memo says that the other felony is 18 U.S. Code

19   Section 231(a)(3), obstructing, impeding, or interfering

20   with a law enforcement officer during a civil disorder, and

21   that is the only other felony in the indictment.  If you go

22   to the guidelines in the appendix in the back, it's not

23   listed there as a statute that you can figure out which

24   guideline applies to it.  It's not there.  And if you look

25   at the guidelines Section 2A2.2 or 2A2.4, it's not listed

1    there either.  But are you telling me that the guideline

2    specifically designated for obstructing and impeding

3    officers does not apply here because this defendant, when he

4    assaulted the officers, had the intent to commit the felony

5    of obstructing and impeding officers?  How would that

6    constitute the intent to commit another felony?

7             MR. PEARCE:  So thank you, Your Honor.

8             I think that if -- a couple of different things to

9    point out.  But most directly, if the other felony were, in

10   fact, just, like, another 111 offense, then I don't think

11   that that would apply.  The difference here is that 231 is

12   an entirely different felony provision.  Your Honor is, of

13   course, quite right that it doesn't show up in the statutory

14   appendix.  We've taken the position -- although I don't

15   think any of -- either you or any of your colleagues has yet

16   had to determine which is the applicable guideline, we think

17   it is 2A2.4 as the starting point for 231, although

18   ultimately, that's not a question that the Court needs to

19   decide here.

20             231 is obstructing or impeding an officer in the

21   midst of a civil disorder.  That is clearly, for double

22   jeopardy purposes, a different felony than what 111(a)

23   criminalizes.  111(a) is forcibly assaulting -- and then a

24   string of other verbs -- a law enforcement officer.  There's

25   no requirement whatsoever that there needs to be a civil

1     disorder.  So those are two distinct felony offenses, and

2     for that reason, 231(a)(3), a distinct felony, is the felony

3     that Mr. Leffingwell intended to commit at the time that he

4     committed the 111(a) assault that is the basis of his

5     conviction.

6              I would add there's not a whole lot of case law on

7     this, but, again, Your Honor is quite right that the only

8     other felony charged in the indictment was 231(a)(3).

9     Courts have found, I think, uniformly that, in fact, there

10    need not be another felony charged for this application --

11    the aggravated assault definition to come into play.  There

12    are a couple of Fifth Circuit cases that are unpublished --

13             THE COURT:  Well, but the Government didn't argue

14    in any pleading that there is some other felony I should

15    consider other than this one; is that correct?

16             MR. PEARCE:  That's correct.  I'm just pointing

17    out that we wouldn't be bound by the fact of what is charged

18    -- what is or isn't charged.  That is not a consideration

19    the Court has to take into account here.  There was a felony

20    that was charged.  It is relevant conduct under

21    Valdez-Torres.  It is a distinct felony offense with

22    distinct elements from 111(a) and it is, therefore, the

23    other felony that -- or the -- when the felonious assault,

24    111(a) -- and I don't take there to be dispute or I didn't

25    hear any of the -- Your Honor's questions to raise whether

 1    the conduct was felonious assault.  The other -- the intent

 2    to commit the other felony is the 231(a)(3) with, again,

 3    dis- -- similar conduct, we acknowledge that, but distinct

 4    elements and a distinct felony offense.

 5              THE COURT:  All right.  Mr. Carroll, I

 6    understand --

 7              MR. CARROLL:  Yes, Your Honor.

 8              THE COURT:  -- and I received your submission,

 9    after the Probation Office revised its assessment, saying

10    that you thought it was accurate.  But aren't you bound by

11    the plea agreement to agree that the aggravated assault

12    guideline can apply?

13              MR. CARROLL:  Yes, I am, Your Honor.  As I

14    responded in my response to your minute order; that we were

15    bound by the agreement and I would have to -- any argument

16    would not be on the guideline level, but it would be under

17    18 U.S.C. 3553(a).

18              THE COURT:  Okay.  All right.  Well, I find, then,

19    that the aggravated assault guideline can technically apply

20    as a matter of law, given the different element and

21    particularly given the defendant's waiver of his right to

22    object.  If it applies, then, the way it affects the

23    guidelines is even more significant, because if you start

24    with the aggravated assault guideline as opposed to the

25    other guideline, you can, then, look at the official victim

1    guideline, Section 3A1.1, and add the six levels, but that

2    provision does not just say, Well, if you've got a law

3    enforcement officer, then we add six levels.  For the

4    six-point enhancement, it says, If, in a manner creating a

5    substantial risk of serious bodily injury -- so we've got

6    two adjectives there -- the defendant assaulted such

7    officer.

8          So my question for the Government is, why do we

9    have that here?  Where is the evidence -- preponderance of

10    the evidence that this was done in a manner creating a

11    substantial risk of serious bodily injury?

12          MR. PEARCE:  So Your Honor, I'd offer two

13    responses, and the first is not directly responsive, but we

14    believe that 3A1.2's (a) and (b) applies and provides the

15    six levels, even without the Court having to get into the

16    question under (c), and I would note that, I believe, all of

17    your colleagues that have sentenced 111 cases in these --

18    thus far in the Capitol breach have applied 3A1.2(a) and

19    (b).  We didn't get into a dispute about this with the

20    probation officer in the PSR because, of course, there was

21    already the -- there was, sort of, the top-level question

22    about 2A1.4's application versus 2A1 -- 2A2 -- sorry, 2A2.4

23    versus 2A2.2.  So you know, I agree that there might be a

24    closer call on 3A1.2(c).  I think there is an argument there

25    and, of course, it is a preponderance of the evidence that

1       swinging wildly at officers, you know, punching one twice

2       and one once does, you know, create a substantial risk of

3       serious bodily injury.  I think there is no additional

4       evidence other than what is before the Court.  I think that

5       actually gets there on a preponderance.  But ultimately, the

6       Court, in our view, would need not act -- make that decision

7       under 3A1.2(c) because 3A1.2 says, If the victim was a

8       government officer or employee.  And, essentially, if it was

9       an offense under 2A2.2, which we are now under, that is the

10      six levels.  3A1.2(c) is an alternate way to get six levels.

11      It's either one path to six or the other path to six, and

12      once you get --

13              THE COURT:  Well, I thought -- you're saying (a)

14      and (b) apply?  Because the one that says, Law enforcement

15      officer, just add three levels; isn't that correct?

16              MR. PEARCE:  That's correct, and then (b) says, If

17      (a)(1) and (a) -- and (2) apply, the applicable chapter is

18      from Chapter 2, Part A, increase by six levels.  And so that

19      is a total six-level enhancement under 3A1.2(a) and (b).

20              THE COURT:  All right.  I need to pull these up,

21      because I was not aware that you were seeking this

22      enhancement on any basis other than (c).  I don't seem to

23      have the guidelines sitting here in front of me.

24              (Brief pause.)

25              MR. PEARCE:  While Your Honor is looking, I would

 1    say that, just for informational purposes, we had actually

 2    never contemplated 3A1.2(c) as the basis.  We had always --

 3    and, admittedly, the guide- -- the plea agreement doesn't

 4    specify the subsection.  It, of course, identifies 3A1.2.

 5    But we had always envisioned (a) plus (b) as the basis for

 6    the six-level enhancement, not (c).

 7                (Brief pause.)

 8                THE COURT:  How would you ever just get three and

 9    not six?  This all --

10                MR. PEARCE:  So --

11                THE COURT:  -- seems so redundant to me.  If the

12    victim was a government employee -- okay, that's true;

13    that's (a)(1) -- and, (2), the offense was motivated by such

14    status, increase by three levels.  So that's, essentially,

15    assaulting the police officer.  And then it says, if both of

16    those are true, increase by six levels.  When would you ever

17    only have three?

18                MR. PEARCE:  So I think an example of a case would

19    actually be one that, I believe, was before Your Honor, an

20    875(c) case where the victim is a government employee, and

21    so there's a threat -- like, an interstate threat made

22    against the victim.  It's not an assault.  So it's not a

23    Chapter -- it doesn't come from Chapter A [sic], Part A.

24    It's not, you know, a -- it's not within the assault

25    guidelines.  So you're going to get a three-level increase,

1    but you're not going to get the additional three which, you

2    know, I think makes sense.  The guidelines would say, If

3    this is an assault on a government official, as opposed to,

4    say, a threat, the guidelines would increase the guideline

5    level there.  So I think there are -- that's the first one

6    that comes to mind.  There may be some additional ones.  But

7    that is why it's a six-level for an assault but a

8    three-level for, say, a threat or potentially other places

9    where you have a government victim who is not an assault

10   victim.

11              THE COURT:  All right.  And, Mr. Carroll --

12              MR. CARROLL:  I'm really --

13              THE COURT:  -- I take it you're --

14              MR. CARROLL:  -- barred from -- I'm really barred

15   from arguing against it, Your Honor, because of the plea

16   agreement.

17              THE COURT:  I understand.

18              MR. CARROLL:  And Mr. Berridge, when he had given

19   me the plea, he said that he had no choice in structuring

20   the plea.  It was given to him and it was -- and I don't

21   begrudge him for that.  He said it was take it or leave it

22   and --

23              THE COURT:  All right.

24              MR. CARROLL:  -- that's the best we could do.

25              THE COURT:  I mean, I, frankly, think that the

1    combination of this enhancement and the aggravated assault

2    guideline -- I think it technically applies, but I do think

3    at the end of the day, the way the Probation Office was

4    looking at it makes the most sense because there's -- the

5    only thing that makes this an aggravated assault is that it

6    was an assault on the officer.  If -- there's so little

7    daylight between the other felony and this felony in this

8    particular case that the disparity between the two

9    guidelines is concerning, but I don't disagree with the

10   Government that if you're looking at 3A1.2(a) and (b) as

11   opposed to (c), that it does fit in this case and that the

12   aggravated assault guideline technically applies in this

13   case.

14            I might spend more time thinking about whether

15   this really constitutes another felony absent the

16   defendant's agreement, but given all of that, I think we

17   have to find that if you add the six levels, you're at a

18   Level 20.  You subtract three levels, then, for his

19   acceptance of responsibility, and that brings you to a Level

20   17.  But I think it's useful to note that if one started at

21   the base level for a physical assault, Section 2A2.3, and

22   that involved physical contact, it would go up to Level 7.

23   And even if you added six levels for an official victim,

24   you'd be at Level 13, and with his acceptance of

25   responsibility, you'd be at a Level 11.  So you know, the

```
 1    disparity is, kind of, enormous.
 2             Given the defendant's criminal history, which is
 3    non-existent, he's in Category I, and that means that at
 4    Level 17, the advisory sentencing guideline range would be
 5    24 to 30 months.  But I note that at Level 11, just for
 6    comparison purposes, the advisory sentencing guideline range
 7    is at 8 to 14 months.
 8             With all of that having been established as what
 9    the guidelines would recommend, would the Government like
10    to -- an opportunity to speak regarding the appropriate
11    sentence in this case?
12             MS. ROZZONI:  It would, Your Honor.  Thank you.
13    And, again, Jennifer --
14             THE COURT:  Go ahead.
15             MS. ROZZONI:  Jennifer Rozzoni on behalf of the
16    United States.
17             First of all, Your Honor, I don't know if the
18    Court has formally admitted Exhibits -- Government's
19    Exhibits 1, 2, and 3, but I would do the -- do so now if the
20    Court has not done so already.
21             THE COURT:  All right.  Those will be part of the
22    record for the sentencing in this case.
23             MS. ROZZONI:  Thank you, Your Honor.
24             And having determined the applicable guideline
25    range here and using that guideline as the benchmark for its
```

1    sentence, as this Court well knows, it also needs to

2    consider the seven factors considered in 18 U.S.C. 3553(a)

3    to determine whether a guidelines sentence is appropriate or

4    whether a variance either up or down would be more

5    appropriate or warranted in this case.  And as I know you

6    know, no particular sentencing factor is more important than

7    another, but I did want to focus in on a couple of factors

8    for the Court to consider.  I certainly won't repeat what

9    we've already put in our sentencing memorandums and notices.

10              First and foremost, looking at the nature and

11   circumstances of the offense, and also, of course, looking

12   at the sentence that you're potentially going to impose

13   reflecting the seriousness of the offense, promoting respect

14   for the law, and providing just punishment, to say that

15   January 6th, 2021, was an unprecedented and historical event

16   in this country's history doesn't really in any way do

17   justice to what happened that day.  On that day, thousands

18   of people brought together by the lie of a stolen election

19   marched on the Capitol, pushed over barricades, attacked and

20   assaulted police officers, and breached the United States

21   Capitol building.  But as one of my colleagues explained to

22   Judge Bates about two weeks ago, January 6th was not just an

23   attack on the Capitol; it wasn't just an attack on the

24   hundreds of men and women who worked there; and it certainly

25   wasn't just an attack on the law enforcement members who

1    were defending those people.  It was an attack on democracy

2    and the rule of law itself.

3          Your Honor, Mr. Leffingwell had every opportunity

4    to make the right decision on January 6th, to do the right

5    thing, and each time he faced a decision, he made the wrong

6    one.  Your Honor, no one is quarrelling with his desire to

7    travel with a friend to Washington, D.C., or to attend a

8    rally of the then-president to hear him speak or even to

9    stand up and be heard about something that he believed in,

10   but if that was all that Mr. Leffingwell did on January 6th,

11   none of us would be here.  Instead, he made other choices,

12   and those choices are what bring him today before this

13   Court.

14         He was sitting at a restaurant that he decided to

15   go to for lunch after the rally by the president.  He was

16   nearly a mile away from the Capitol.  And there was another

17   patron in the restaurant who said that crazy things, in his

18   words, were happening.  At nearly 3:00 p.m., almost an hour

19   after rioters had actually begun attacking and entering the

20   Capitol building, Mr. Leffingwell had the choice to leave

21   the restaurant, and he made a choice to leave and begin

22   walking.  He walked nearly a mile.  And at any time during

23   that walk, Your Honor, he could have decided to turn back;

24   he could have gone another way, but he didn't.  He continued

25   to follow the crowd, a crowd he admits was chanting and

1    shouting.  He admits to seeing, in his words, busted doors,

2    but he, again, decided to keep going.

3          He arrived at the Senate doors around 4:00 p.m.,

4    allow -- about two hours into the riot, and he made a choice

5    to walk in through those doors and entered the Capitol

6    building.  He encountered a significant line of police

7    officers, Your Honor.  You have the video that shows that.

8    And he, again, had a decision to make.  And, again, he

9    didn't leave.  He didn't turn back.  He instead pushed his

10   way to the front of the crowd and he stood there, because he

11   had come so far and he wanted to be a part of it.

12         Your Honor, Mr. Leffingwell knew what he was doing

13   that day.  He thought the people who stayed outside were

14   scared.  He chanted, as you have already noted, shame, stop

15   the steal.  He spoke to one of the officers that he

16   eventually hit that day, and when the officer told him that

17   he was just doing his job, he told the officer, That's what

18   the Nazis said.

19         Defendant admitted that he didn't want to be

20   pushed out of the building by the officers.  In fact, he

21   actually believed that he could throw some punches and run

22   away.  Given his military experience, he knew that what the

23   officers were wearing would prevent them from fighting very

24   well.  He wanted to rattle them.  You have Exhibits 1, 2,

25   and 3, Your Honor.  Exhibits 1 and 2, you can see him punch

1    one officer and then another, and then there's a brief

2    moment, and then he punches that same officer again.

3    Fortunately, those attacks didn't cause any direct physical

4    injury, but as the exhibits and the videos show, it

5    certainly wasn't for any lack of trying on his part.

6         Mr. Leffingwell had a chance and another chance

7    and another chance, an opportunity and another opportunity

8    to make the right choice on January 6th, to do the right

9    thing, and instead, he chose to walk a mile to the Capitol.

10   Seeing the violence, he walked into the building and he

11   faced off with officers.  And when they attempted to push

12   him out, he punched two of them in the head.  The nature and

13   circumstances of the offense and the need for whatever

14   sentence you impose to reflect the seriousness of the crime,

15   promote respect for the law, and to provide just punishment

16   do support the 27-month sentence that the Government seeks.

17        Your Honor, I just wanted to touch briefly on the

18   defendant's history and characteristics because, as you

19   know, the defendant spends most of his memorandum and

20   presumably his argument today talking about that factor.

21   And I want the Court to know that the Government appreciates

22   that Mr. Leffingwell suffered a traumatic brain injury while

23   honorably serving this country in the military.  The

24   Government appreciates and in no way disputes that his

25   injury causes his problem -- causes him problems with his

1   memory and, certainly, impacts his ability to hold a job

2   full time.  But, Your Honor, despite all of that, defendant

3   knew better, and the reason that you know he knew better is

4   because of the letters that you discussed at the beginning

5   of this hearing from his friends, from his neighbors, his

6   uncle, his brother.  He had a good childhood, and that's

7   actually more than most defendants who come before this

8   Court can probably say to you.  He had two good parents.

9   They were decent.  They raised him to know right from wrong.

10  He joined the Marines.  He served his country.  He knows how

11  to be a good citizen.  All of those letters tell you that

12  he's been a good father, he's been a good husband, and he's

13  been a good neighbor and a good brother.  Those letters tell

14  you all of that, despite the injuries that he suffered.  He

15  knows right from wrong, good from bad.  He knew it then and

16  he knows it now.

17          His injuries didn't cause him to board a plane to

18  Pennsylvania to join a friend in a car to go to Washington,

19  D.C.  They didn't cause him to have his lunch and have a

20  couple of beers and walk up that mile to the Capitol to see

21  what was happening.  From entering the Capitol where he

22  encountered the line of police; from pushing his way to the

23  front and yelling shame and stop the seal, he -- steal, he

24  knew very much what he was doing.  And even more

25  problematic, Your Honor, his experience in the military told

1    him and gave him the knowledge that other people in the

2    crowd actually didn't have that day, that the officers in

3    their riot gear would be impeded to some degree with their

4    ability to fight.

5         Defendant Leffingwell knew why he was at the

6    Capitol on January 6th, Your Honor.  He believed the lie

7    that the 2020 presidential election was somehow stolen and

8    he was at the Capitol to do something about it.  In his

9    letter, Defendant Leffingwell's brother said that the

10   defendant's actions -- you noted this, Your Honor -- were

11   due in part to misguided patriotism.  To be clear, this was

12   not patriotism, misguided or otherwise.  What Defendant

13   Leffingwell did on January 6th was an act of domestic

14   terrorism and he should be punished consistent with his

15   crime and what he did that day.

16        For all of these reasons, Your Honor, and the

17   reasons stated in our sentencing memorandum and our notices,

18   we, again, respectfully request that a sentence of 27

19   months' imprisonment, 3 years of supervised release, and a

20   2,000 -- and $2,000 in restitution be implemented in this

21   case, Your Honor.

22        THE COURT:  All right.  Thank you.

23        Mr. Carroll, would you like to speak on the

24   defendant's behalf?

25        MR. CARROLL:  Yes, I would, Your Honor.

1          Your Honor, first off, his friend Jake that wrote

2     the letter to you when you were concerned on why he didn't

3     respond on certain issues, when he had called me about

4     writing a letter on Mark's behalf, I said, Under no

5     circumstances do you say anything that might indicate that

6     he's not accepting responsibility for this.  I don't want

7     any bad -- mixed signals being sent to the judge that, you

8     know, it wasn't all his fault.  It was his fault, and he

9     should not have been there and he should not have hit those

10    police.

11          The Government --

12          THE COURT:  I appreciate your giving me that

13    information, Mr. Carroll, because I -- the letter was

14    troubling to me.  So thank you for that.

15          MR. CARROLL:  And he did not plan to come to D.C.

16    His friend had bonus miles and said, Do you want to come to

17    this?  And that's why he flew across the country to do that

18    and they drove down there.  And he didn't come here to riot.

19    He came here to listen to President Trump.  And when he

20    heard what was going on in the Capitol, they walked up

21    there.  And they didn't climb through windows; they didn't

22    break down doors.  They walked through the doors at 4:00

23    o'clock.

24          Now, I'm sure the Court has looked at the film

25    where he was standing next to the police.  He was surrounded

1    by the police, and it was not like the other people there

2    that had chairs or barricades breaking down doors or windows

3    climbing through it or pushing the police back.  That was

4    not the case at all.  He was surrounded.  And if you look at

5    the tape as well, Your Honor -- and it's a -- please don't

6    think that I'm trying to minimize what he did or justify his

7    actions, but he was pushed by the police.  I -- he had no

8    business being there; he had no business throwing punches,

9    but it was reaction and it was deliberate, but -- and he got

10   arrested for it.  And also, if you look at the tape on that,

11   he barely got those punches off the police were so close to

12   him, and they put him on the ground immediately, dragged

13   him, and handcuffed him.  Those -- and also, when they had

14   handcuffed him and they brought him over to the Capitol

15   Police central cellblock and the two young officers said, Do

16   you remember us, he said, No, and they said, We're the guys

17   you punched, he apologized immediately.  He knew he screwed

18   up, Your Honor.  He -- it was against the law for him to be

19   in there, it was against the law for him to punch the

20   police, and we're not minimizing that, but he knew that what

21   he did was wrong and he apologized immediately.

22            Additionally, Your Honor, if this was outside the

23   Capitol -- and not to minimize, again -- and he had gotten

24   in a fight with the police, the plea offer would have been

25   assault on a police officer -- or excuse me, the charge

1    would have been assault on a police officer unless the

2    officer was actually hurt, and the plea offer from the U.S.

3    Attorney's Office would have been simple assault or they

4    might not have papered it at all because of the number of

5    officers involved in looking at that film thinking, How

6    would a jury react to this?  I know how a jury would react

7    based on January 6th, but on a -- on -- say, on another

8    disturbance in the city, a jury probably would not convict

9    on that based on what happened, but I'm not trying to

10   downplay what he did.

11           And also, from the start of this, he admitted to

12   me that what -- that, you know, he wanted to get rid of this

13   case as fast as they did; that he shouldn't have done it, he

14   was sorry about it, and let's see what we can do.  And so

15   from the start, I had told the Government, you know, Give us

16   a plea offer.  Well, they couldn't, because they didn't have

17   the film, and that's why it took so long to -- and they

18   said, There will be no offers coming until all the film has

19   been reviewed, and that's -- and as soon as we had it and I

20   looked at it, I said -- and I told Chris Berridge that, you

21   know, Give us an offer.  And he said, I can't.  He says, It

22   will come from upstairs.  And that's how that plea offer

23   entered -- got entered there.

24           But he has accepted responsibility from the start,

25   and he knows what he did is wrong, but I would ask the Court

1    to -- looking at that film, to let the punishment fit the

2    crime in this matter.  He was not one of the instigators.

3    He walked up to the Capitol.  He was surrounded by police.

4    Listening to that tape, you don't hear any warning that he's

5    going to be knocked out of the door and knocked back.  They

6    just went at him and that's when he reacted, and his

7    reaction -- I mean, they had him on the ground.  There

8    wasn't much he could do.  And I would ask the Court to

9    reflect on his service to his country, the injuries he has

10    sustained for this.

11          And also, Your Honor, I -- in my memorandum in aid

12    of sentencing, I gave the Court different ways the Court

13    could sentence him, and Probation has asked for probation,

14    and I would ask the Court to follow the recommendations of

15    the Probation Department, but in the event that the Court is

16    not going to follow the recommendations from Probation, it's

17    going to give him some time, I would ask the Court to make

18    it 59 days or less so he doesn't lose his pension.  He'll --

19    the likelihood is he would never get it back if he goes to

20    prison at --

21          THE COURT:  Well, why do you say that?  The

22    regulations don't say that.

23          MR. CARROLL:  In this day and age and with what

24    happened at the Capitol, I don't see anyone being

25    sympathetic to him when he reapplies for his pension.  I

1   don't see anyone in the Pentagon coming to bat for him, and

2   I don't -- and anyone that did come to bat for him would

3   probably risk being not demoted but would have a cap on

4   their career.  The -- I just don't see anyone coming out in

5   his favor.  And if he loses his pension, that will be -- the

6   punishment that will do to his family and children, Your

7   Honor, he will not be able to reverse and --

8            THE COURT:  Is it your understanding that under

9   the regulations, it's discretionary or is it mandatory that

10  he gets it back?

11           MR. CARROLL:  It's discretionary, and I put that

12  in my memorandum in aid of sentencing.  He has to apply.  He

13  would have to go before a board.  And who knows what would

14  happen before a board hearing of something like this?

15  Because the military now is trying to root out white

16  extremists.  Now, he's going to be looked at as a white

17  extremist, you know?  Former military guy and being involved

18  in something like that, the chances of him looking -- them

19  looking kindly on him, I think, are not very good.  So if

20  the Court --

21           THE COURT:  Well --

22           MR. CARROLL:  -- could structure --

23           THE COURT:  -- under the regulations, 38 C.F.R.

24  Section 3.665(a), it says the benefits, quote, Shall be

25  resumed after release.  You sent me a quote from the website

1    which says, May or can, but then I looked at the underlying

2    regs and it uses mandatory language.

3            MR. CARROLL:  I had looked at the regs, too.  I

4    didn't see that, Your Honor.  I didn't see the word "shall."

5    I had seen "may."

6            THE COURT:  What regulation were you looking at?

7            MR. CARROLL:  You know, you -- to be honest with

8    you, Your Honor, I wasn't going to bury the Court with a ton

9    of paperwork, but, you know, it's like dealing with the BOP

10   in the regs on making payments on restitution.  The -- there

11   are criss-crosses in the regulations that contradict each

12   other.  And what I had saw on their website, and also,

13   looking at the regs was that it was "may" and was after a

14   hearing.  So I would ask the Court if you could fashion the

15   sentence, whether it be in a half- -- if the Court wanted to

16   give him more than 60 days or the Court could designate that

17   above 59 days would be in a halfway house, because a halfway

18   house wouldn't count towards the period of incarceration.

19           Additionally, Your Honor, on the restitution, the

20   only federal prison in Washington State is the one that I

21   cited, the SeaTac which is outside of Washington.  The next

22   closest one is in Oregon and that's more than four or five

23   hours away from his family.  And I was going to ask the --

24   if the Court would recommend that and cap his -- if he's

25   able to get a job -- if the Court's -- is going to

1    incarcerate him, to cap his payments at $20 a month so they

2    don't break him in prison, because his wife does not have a

3    job and there's, like, a black cloud over her now because of

4    the charges against her husband.

5            So there must be some way the Court can fashion a

6    sentence that punishes him and society gets what it needs

7    but doesn't ruin his -- him or his family's life forever.

8    He's got a ninth-grade boy and a twelfth-grade boy and they

9    need to go to college or go to a trade school.

10           (Brief pause.)

11           There have been worse criminals before Your Honor.

12   I can assure you.

13           And with that, I will give -- like I said, if you

14   look at the film of that, I think the punishment should fit

15   the crime, Your Honor.  In this, he wasn't, like, someone

16   that was attacking the police.  They pushed him and he

17   reacted.  He shouldn't have done it.  He had no business

18   being there.  He should not have punched anyone.  But it was

19   a reaction.  And I would ask the Court to take that all into

20   consideration, Your Honor.  And I won't say any more.

21           THE COURT:  All right.  Thank you, Mr. Carroll.

22           Mr. Leffingwell, this is your opportunity if

23   there's anything you would like to say for me to consider

24   before I impose sentence in this case.

25           THE DEFENDANT:  Thank you.

1              Yes, Your Honor.  I just -- I want to emphasize

2      that I'm embarrassed and ashamed of myself about what

3      happened.  It was not something I planned to do, and looking

4      back on it, it feels like a nightmare, and I -- I'm just

5      remorseful and embarrassed and I feel like I'm sorry for

6      taking everyone's time for -- the whole thing is just -- I

7      wish I could go back and make it not happen.

8              MR. CARROLL:  Thank you, Mark.

9              THE COURT:  Thank you.

10             What I'd like to do is just take a minute or two

11     to gather my thoughts, having heard all of that, all of

12     which I appreciated, and then I'm going to return and impose

13     sentence in this case.  And so I would ask you to not go

14     far.  I don't think it's going to be more than about 5 or 10

15     minutes, but I need to take a break just to process

16     everything I've just heard and pull it together.

17             Thank you.

18             THE DEPUTY CLERK:  This Honorable Court will now

19     take a brief recess.

20             (Brief recess taken.)

21             THE DEPUTY CLERK:  This Honorable Court is again

22     in session.  Please come to order.

23             Your Honor, recalling Criminal Case No. 21-5, the

24     United States of America v. Mark Jefferson Leffingwell.

25             Mr. Carroll represents the defendant; Ms. Rozzoni

 1    and Mr. Pearce represent the Government; the probation

 2    officer is Ms. Newton.

 3              THE COURT:  I lost Mr. Carroll.

 4              (Brief pause.)

 5              THE DEPUTY CLERK:  I have his camera, but I don't

 6    have his --

 7              (Brief pause.)

 8              Mr. Carroll?

 9              (Brief pause.)

10              MR. CARROLL:  Okay.

11              THE COURT:  All right.  Mr. Leffingwell, as I said

12    when I started, there's a statute that tells me the things

13    I'm supposed to think about when I sentence someone.

14    Actually, I'm going to be talking for a while.  And the

15    first thing that I'm supposed to think about is the nature

16    and circumstances of the offense.  And that is, what did you

17    do?

18              You pled guilty to assaulting, resisting, and

19    interfering with a law enforcement officer in the United

20    States Capitol on January 6th.  You punched the first

21    officer and then you punched another trying to restrain you.

22    More than one officer, more than one punch.  It was wrong,

23    it was unconscionable, and I know you know that.  That being

24    said, the officer wrote me a statement of facts that the day

25    this happened, when he saw you at the central cellblock, you

1    spontaneously volunteered that you were sorry for hitting

2    the officer, and then when he told you it was him, you

3    apologized to him directly.  You are not someone who decided

4    to wait to say you were sorry until the day you were

5    standing here waiting to be sentenced.  You also expressed

6    remorse and embarrassment when you were interviewed back in

7    August.  And unlike many of the people charged in connection

8    with January 6th, you're not somebody who was sending out

9    angry, incendiary texts or messages before January 6th,

10   urging other people to come, to stop what Congress was about

11   to do, or making threats.

12            I do believe, though, that you understood, and

13   understand, that day that it was wrong to have been in the

14   building on that date at that time.  You told me at the time

15   you pled guilty you didn't know you couldn't go in.  By the

16   time you got to the door, maybe, it was already open.  You

17   didn't have to fight or break your way in, but the officers

18   surrounding the building were sending a pretty strong

19   message.  Either way, it is a fact that on that day, the

20   Capitol building was closed to the public because, in

21   accordance with the United States Constitution, a joint

22   session of Congress had been convened to certify the vote of

23   the Electoral College in the 2020 presidential election.

24   Vice President Mike Pence, a Republican, was present and

25   presiding as the constitution required him to be.  This was

1    the subject of great consternation to the speakers you

2    listened to.  The United States Capitol Police officers

3    surrounding the building, federal law enforcement officers

4    doing their jobs, were overcome as thousands of people

5    demanded entry and eventually broke their way in.

6            You were one of the individuals who, then, entered

7    the closed building, and the certification process was

8    interrupted as members of Congress and the Vice President

9    had to be rushed away to safety or were forced to hide under

10   tables.  The conduct that day ranged from people who just

11   went to the Capitol and stood outside and made their voices

12   heard, and they aren't charged with anything; then there

13   were the people who entered the building.  They have

14   generally been pleading to misdemeanors.  But they all

15   played a role.  Everyone who walked in of their own free

16   will added not only physical mass to the mob but power to

17   the mob.  It made it that much harder for the besieged

18   officers to do their jobs.  It contributed to the

19   dangerousness of the situation, it contributed to the damage

20   to the building, and it prolonged the period of time before

21   the halls could be cleared and secured and Congress could

22   resume doing the people's business.

23           And then there were the people who broke in or

24   damaged property or stole property or attacked other people,

25   and the facts in your case put you in that group at the more

1    serious end of the spectrum, punching police officers.  As

2    your lawyer said in his memo, though, one important piece of

3    evidence that has to be considered when deciding where you

4    stand when compared to the other people who were also there

5    that day is the video.  In all three clips the Government

6    submitted, you were already inside the building, but you're

7    just inside the door.  You're leaning against the wall.

8    There are officers in front of you.  A large number of them

9    have amassed.  They're wearing helmets and shields and riot

10   gear, but they're not doing anything actively to stand their

11   ground.  Some of them are even behind you holding off a

12   large group of people still trying to get in the door.  So

13   somehow, you managed to get yourself in ahead of the crowd.

14            But what are you doing?  Mostly, you're standing

15   there.  And this surprised me when I viewed the videos,

16   given the passion and the anger in the prosecution's

17   sentencing memo.  Government attorneys, like me, have

18   watched hours and hours of this video.  And they've probably

19   watched a lot more than -- hours than I have.  And we've

20   seen people shouting, people pushing, people climbing up the

21   side of the building, people climbing in through broken

22   windows, people being completely disrespectful of their

23   surroundings, people yelling threats, being profane,

24   defiling the building, damaging property, stealing property.

25   For a while, though, Mark Leffingwell just stood there.  And

 1    that caught my attention compared to what was going on all

 2    over the building at the time.  The group behind you was

 3    loud and angry, pointing and chanting.  And every now and

 4    then, you did join in.  Stop the steal.  Join us.  But your

 5    affect and your demeanor didn't change that much.  You were

 6    not really pointing or threatening; however, there comes a

 7    point where the protesters are told to back up, and some of

 8    them are directing the others to comply, and you turned back

 9    to offer, If you back up now, you won't get in, and that's

10    also a part of the nature and circumstances of the offense.

11    This supports the view that you weren't just carried along

12    by a crowd.  You understood that entering was the point of

13    the exercise, and you wanted that group, that mob, to be

14    there to put the pressure on the officers, but then the

15    officers at the entrance decide or are directed to push

16    back.  They start to push the crowd back outside, and you

17    were right in front.  So they do push you, though I might

18    differ with your lawyer's choice of the verb that you are

19    knocked back.  And as they start to push you, then you punch

20    back not once but multiple times, but it's quick and it's

21    over quickly because you're subdued and not until you

22    punched a second officer trying to arrest you.  To the

23    extent the punches landed, it doesn't appear that you hurt

24    anyone -- they were well protected -- and then it was over.

25              So I was initially feeling that perhaps the

1    Government was overreaching when I read its memo.  And I

2    didn't necessarily agree with you, Mr. Carroll, that if a

3    50-year-old guy with no prior criminal record hit an officer

4    who was trying to move him or arrest him, it might result in

5    a lesser charge or a lesser sentence than what's being

6    sought here, whether I agreed with your prediction that it

7    would be no-papered entirely, but this didn't occur.  He

8    wasn't pushed by an officer on the street.  He was inside a

9    federal building where he was not supposed to be.

10           And then I got the information about how the

11   defendant described that day himself when he was

12   interviewed.  And, once again, Mr. Leffingwell, I give you a

13   lot of credit for being completely candid.  You didn't

14   sugarcoat anything and you expressed a lot of regret.  But

15   it put to rest the notion that you didn't understand what

16   you were doing or that you acted only out of impulse or that

17   I can let this go without consequences, because in my

18   respect -- within my respect for your service and compassion

19   for your injury, I was assuming facts that weren't

20   necessarily true and excusing conduct that it turns out was

21   inexcusable.

22           So what do I understand now did happen on January

23   6th?  Troubled by the allegations of election fraud, you

24   came to the District to be part of a strong show of support

25   at the rally.  And I agree that given all the circumstances,

you may have been more susceptible to the propaganda and the
false allegations that were brought at the time than other
people, but the crime and the charge is not believing that
the election was stolen and the crime is not coming to a
rally, even a rally organized on false pretenses.  It was
perfectly lawful, acceptable conduct.  Although even just
coming to the rally was a little peculiar in your case,
given what I've been told about how stressful crowds can be.
And I know that quite some time ago, it was strongly
recommended that you stay away from talk shows and the
Internet and political content, but apparently you made a
decision with input from your friend and family to expose
yourself to a large, likely raucous crowd with the potential
of counterprotesters and police all around.  Whether that
was a wise choice under all the circumstances, it was your
choice to make, and you went to the rally.  And afterwards,
you and your friend knew the crowd was headed to the
Capitol, but you didn't go.  You went to lunch.  That's all
okay so far.

          After lunch, you learned from someone looking at
her phone in the restaurant that crazy things were going on
at the Capitol, and you two decide to head towards what's
going on.  3:00 o'clock p.m.  If you'd looked at any TV or
any phone by that point, you would have seen coverage that
made it abundantly clear that it was a wild scene and that

1   people going inside were not supposed to be there.  There's

2   no evidence that you did, and you said you'd actually given

3   your friend your phone.  Either way, you walked towards what

4   you've already been told is crazy.  You say you don't recall

5   seeing police around the building, but you saw people

6   yelling and chanting and you saw busted doors and you were

7   not deterred.  You join the crowd.  You're not sure where

8   they're headed.  The crowd makes it to the door of the

9   Senate wing and comes to a stop.  You decide to move up to

10  the front of the crowd.  Your friend does not come with you.

11  The guy who's supposed to be accompanying you on this

12  trip -- the friend whose judgment you're supposed to be

13  relying upon -- decides he is not going inside, but not you.

14  You are not deterred.  You made a choice.

15          You could tell after you pushed your way to the

16  front of the crowd exactly why it had been stopped.  There

17  was a huge police presence blocking their way.  You knew

18  then if you hadn't known before that you weren't supposed to

19  enter, but you were still not deterred.  You'd come all that

20  way, you said, and you wanted to get inside.  And, in fact,

21  you looked down on the people who didn't.  The ones who

22  didn't want to face the overwhelming force inside, you

23  thought they were cowards, and you used a different, more

24  insulting word that I don't care to repeat to describe them,

25  but they were scared as you saw it.  You were proud that you

1     weren't.  And that's an important fact.  I've had many

2     people stand in front of me whose entire excuse for what

3     they did on January 6th was they were -- that they were just

4     carried along with the crowd, but you were disdainful of the

5     crowd.  You pushed on when they didn't.  At this point,

6     these are your actions and they are your choices and we

7     can't blame anyone else.  And while I have no reason to

8     doubt your friends and family who reported that you were

9     particularly vulnerable to misinformation, I can't chalk

10    these actions up to being gullible or impressionable because

11    nobody was goading you on but you.

12              So you get inside, but you don't get far.  And the

13    video corroborates your account that you were just standing

14    there at that point unclear what you were going to do next.

15    And you joined some of the chants, but those really aren't

16    as troubling to me as your decision to shout out directions

17    to the others not to back up, but you felt stupid standing

18    there just looking at the officers.  You weren't being the

19    brave guy you decided to be when you were outside.  You'd

20    talked to the one who was standing right in front of you and

21    he told you he was just doing his job.  Your response:

22    That's what the Nazis said.  And you knew even then that

23    that was completely uncalled for.  You are a man of service,

24    you are a man of duty, you're a student of history, and you

25    knew that they were doing what they were supposed to do.  It

1   was the same thing that you've explained to schoolchildren

2   that you were doing in Iraq: protecting our country,

3   protecting our freedom.  And then there comes a point when,

4   for those very reasons, the police begin to push the people

5   back.  And I understand and I know that you were sincere

6   when you said you don't react well to being pushed; that

7   everything you've been through is part of what led to your

8   overreaction that day, and I have to consider that, and I

9   will, but your records don't reflect an actual PTSD

10  diagnosis, although some of the letter writers assumed that

11  was a good explanation, and I can't ignore the fact that you

12  made the deliberate decision to walk towards the Capitol, to

13  walk towards the fray, to get to the front of the line, to

14  encounter the officers face to face.  You chose this battle,

15  and you patted yourself on the back for your bravery.

16          And it seems from the video, also, that your

17  reaction wasn't just instantaneous.  It wasn't just

18  instinct.  It's not automatic the second you get pushed.

19  There's a bit of a gap of time.  And, unfortunately, you

20  explained to the Government that you thought about it.  You

21  said you didn't want to be pushed out after you'd traveled

22  all that way.  You said you figured that you might be able

23  to throw a few punches and escape without being detained.

24  You've worn Kevlar before and you knew they wouldn't be able

25  to fight very well in their gear.  You had a strategic

1    advantage.  So you felt you should -- you could possibly

2    rattle the officers and then leave.  So you threw some

3    punches, not just one, and striking not just one but two

4    officers.  This was a considered; it was a deliberate

5    attack.  So now, I understand Mr. Berridge's indignation in

6    his sentencing memo and I cannot just let this stand.

7            But the second thing I'm supposed to think about

8    is the history and characteristics of the defendant.  That

9    is also an important part of this story.  You have no prior

10   criminal history whatsoever.  You are a loving father.  You

11   are committed to helping people in your neighborhood and

12   your church and your community using the skills that you

13   have.  The letters of support say a lot about you, and I

14   won't repeat what I set out before, but they all bear on

15   this factor.  You are a veteran, a United States Marine

16   honorably discharged who reenlisted during the war in Iraq.

17   You had served your country already, but you chose to serve

18   again, and you were decorated for that service and you were

19   exposed repeatedly to blasts from mortar rounds and IEDs and

20   you suffered multiple military service-related blast and

21   impact traumatic brain injuries.  And so as determined by

22   the VA, you are disabled directly arising out of your

23   service to this country.

24           The last thing that the sentencing statute tells

25   me I have to think about is that I am required to impose a

1    sentence that's sufficient but not greater than necessary to

2    accomplish the purposes that are set out in the statute, and

3    there are a lot of them, but another factor I must consider

4    is the need for the sentence imposed -- starting at the end,

5    the need to provide restitution to any victims of the

6    offense.  And according with the plea agreement, you will be

7    ordered to pay $2,000 towards the more than $1-and-a-half

8    million worth of damage done to the Capitol that day by the

9    group.  But I'm also supposed to think about the need for

10   the sentence to reflect the seriousness of the offense, to

11   promote respect for the law, and to provide just punishment

12   for the offense.  I'm supposed to afford adequate deterrence

13   to criminal conduct.  And that doesn't just mean by you, but

14   by other people.  I'm supposed to protect the public from

15   further crimes committed by you.  I'm not sure that's a very

16   serious factor here.  I don't think that's a big risk here.

17   And I'm supposed to consider whether you need any kind of

18   training or treatment and what the most effective manner

19   would be to get you that.  And I'm supposed to consider the

20   need to avoid unwarranted sentencing disparities among

21   people with similar records who have been found guilty of

22   similar conduct.  And basically, what that means is your

23   sentence has to be fair when I compare it to sentences that

24   other people get who do similar things.

25            The guidelines are supposed to help with that

1    function.  And if one were looking at the conduct alone,

2    there is no question that you would be facing a sentence of

3    incarceration under any of the potential calculations.  The

4    statute specifically says that a criminal sentence is

5    supposed to serve the purposes of punishment and promote

6    respect for the law and reflect the seriousness of the

7    offense.  And I am told that you are a man who believes

8    deeply in the ideals that America stands for; that you

9    believe deeply and seriously in freedom and that you love

10   our country.  Storming the Capitol on January 6th was

11   contrary to all of that.  And just being where you're

12   supposed to -- weren't supposed to be was just the tip of

13   the iceberg.  Punching law enforcement officers who were

14   just trying to do their jobs was contrary to all of that.

15   It was contrary, as your brother told me, to the values and

16   ideals that were instilled in you by your parents and by

17   which you have lived your entire life.  So to fulfill those

18   goals, I have to think seriously about incarcerating a

19   person -- even if that person was a decorated veteran who

20   served this country -- who did what you did; who knew and

21   should have known better and did know better, even with your

22   lack of prior criminal history and a family and home that

23   needs you and all of the unique personal circumstances.

24            And on top of these purposes, the statute also

25   specifically says that I'm supposed to think about deterring

1    not just you from breaking the law but other people from

2    doing this in the future.  And there is, unfortunately, a

3    very real risk of that.  The heated rhetoric that got you

4    riled up and brought you to Washington, D.C., has not

5    subsided.  Misinformation is not only available; it's

6    getting louder and louder every day.  You weren't the only

7    person to fall for it or to embrace it, and some have

8    embraced it who don't even believe it.  The lie that the

9    election was stolen and illegitimate is still being

10   perpetrated.  Indeed it's being amplified not only on social

11   media but on mainstream news outlets and, worse, it's become

12   heresy for a member of the former president's party to say

13   otherwise.  So it needs to be crystal clear that it is not

14   patriotism, it is not standing up for America, it is not

15   legitimate political discourse, and it is not justified to

16   descend on the nation's capital at the direction of a

17   disappointed candidate and disrupt the electoral process.

18   Canceling out the votes of other people with a show of force

19   is the opposite of what America stands for.  It is the

20   definition of tyranny; of an authoritarianism.  Attacking

21   the law enforcement officers trying to preserve order in our

22   seat of government, trying to protect the public servants in

23   the building isn't patriotism either.  It's not what the

24   military trained you to do.  And it's contrary to the whole

25   notion of supposedly caring about blue lives if you don't

1    care about them when they're standing in your way instead of

2    in somebody else's.

3          That being said, I'm not sentencing a hypothetical

4    person.  I'm sentencing you.  And I understand the concerns

5    about your ability to tolerate or function in an

6    institutional environment.  But without putting undue

7    emphasis on the point, it's also fair to say that it's not

8    the Court's fault, the officers' fault, or the Government's

9    fault that you find yourself in this position.  And I think

10    it would not be consistent with who you are and what you

11    stand for or even what I think you expect to say that this

12    will go without consequences.

13          But all that being said, I agree that the sentence

14    sought by the United States and even sentences within the

15    lower guideline ranges that could be applicable would be

16    greater than necessary.  You were arrested and detained for

17    a day or two for the first time in your life.  You're now a

18    convicted felon and you deeply embarrassed yourself and your

19    family.  And I believe there are other sanctions I can

20    impose that will further the purposes of a criminal

21    sentence.

22          Another thing I've thought about is the

23    representation in the sentencing memo that VA disability

24    compensation payments are reduced if a veteran is convicted

25    of a felony and imprisoned for more than 60 days.  The

1    webpage that was quoted said veterans rated 20 percent or

2    more are limited to the 10 percent disability rate.  For a

3    veteran whose disability rating is 10 percent, the payment

4    is reduced by one half.  Once a veteran's released from

5    prison, compensation payments may be reinstated based upon

6    the severity of the service-connected disability at that

7    time.  You have the highest level service-connected

8    disability.  But none of that was clear, and that was just

9    the website.  So I did look into the regulations, because I

10   think it would be a sanction that's greater than necessary

11   to permanently deprive you of a portion of the disability

12   benefits you truly earned and you and your family deserve.

13          As the defense noted, the reduction kicks in as of

14   the 61st day, and it is a significant reduction, although it

15   doesn't drop to zero if the disability is rated more than 20

16   percent.  However, as far as I can tell from all the

17   research I was able to do, under 38 C.F.R. Section 3.665(a)

18   which is the disability provision at the pension provision,

19   your dependents can apply to have the benefits apportioned

20   while you're incarcerated; and under Section (i), whether

21   apportioned or not, the benefits, quote, Shall be resumed,

22   closed quote, after release.  That language is mandatory,

23   and that factored into my analysis, as well.

24          Mr. Carroll, before I enter the judgment and

25   commitment order in this case, I will give you an

1      opportunity to provide me with any information that says I'm

2      wrong about that, in which case I would review what I plan

3      to do and consider what you've talked about with the

4      community confinement.

5              Therefore, putting all the information together in

6      one of the most difficult sentencings I've had, and in an

7      exercise of my discretion, after considering all the

8      statutory factors, I find that the following sentence is

9      sufficient but not greater than necessary:

10             It is the judgment of this Court that you are

11     hereby sentenced to a period of six months on Count 1 with

12     credit for any time you already served.  I find by clear and

13     convincing evidence you -- that you are not likely to flee

14     or pose a danger to the community and, therefore, I will

15     permit you to voluntarily surrender when the Probation

16     Office notifies you of the date and location where you must

17     report.  This is based on a consideration of all the

18     statutory factors, including the history and characteristics

19     of the defendant and all of the statutory purposes of a

20     criminal sentence.  That would be my sentence whether I

21     applied the enhancement for official victim, aggravated

22     assault, or not, and had the adjusted offense level been 11,

23     12, 16, or 17.  I urge the Bureau of Prisons to designate

24     the defendant to serve his sentence at a facility as close

25     to his home as possible and at the lowest level of security

1    as possible, taking great care to consider his medical

2    situation.  I note that as far as I could tell, the language

3    in the veterans benefits regulation was mandatory, but I

4    would also urge the VA in the strongest possible terms to

5    reinstate his benefits after the sentence has been served,

6    consistent with his 100 percent rating of his

7    service-related disability.

8                And, Mr. Carroll, I don't know how long you want,

9    but, as I said, I will wait to sign the G& -- J&C if you

10   want to give me additional information on whether this is

11   something that's mandatory or whether it's discretionary.

12               MR. CARROLL:  Your -- when Your Honor went to

13   chambers, I had looked on the Internet and I saw one website

14   that said the manda- -- the -- that it was discretionary on

15   reinstatement and I saw another that said "shall" and -- but

16   neither one of those are -- referred to the regs.  Could you

17   give me the C.F.R. number that you -- could you say that

18   again?

19               THE COURT:  The regulation I was looking at was 35

20   -- I'm sorry, 38 C.F.R. Section 3.665.

21               MR. CARROLL:  Okay.  I'll take a --

22               THE COURT:  And --

23               MR. CARROLL:  -- look at that.

24               THE COURT:  -- how long do you want?  Do you want

25   a week --

1          MR. CARROLL:  Yeah, that would be --

2          THE COURT:  -- to get me --

3          MR. CARROLL:  -- fine, Your Honor.

4          THE COURT:  -- something?  All right.  So I'm not

5     going to do any- -- and if you decide you're not going to

6     file anything or if it confirms that it's mandatory, I would

7     appreciate it if you would file a notice just telling me one

8     way or the other what your position is.

9          MR. CARROLL:  I'll respond either way, Your Honor.

10          THE COURT:  All right.

11          You are further sentenced, Mr. Leffingwell, to

12     serve a 24-month term of supervised release.

13          I find that you do not have the ability to pay a

14     fine and, therefore, waive the imposition of a fine.

15          You are, because you're convicted of a felony,

16     required to pay a $100 special assessment.  It's immediately

17     payable to the Clerk of the Court for the U.S. District

18     Court of the District of Columbia.  And while you're

19     incarcerated, you can make payments on the special

20     assessment through your participation in the Bureau of

21     Prisons's Inmate Financial Responsibility Program.

22          Within 72 hours of your release from custody, you

23     must report in person to the Probation Office in the

24     District in which you're released.  I will transfer

25     supervision to the District in which you reside, but I will

1      not transfer jurisdiction over this case to another court.

2                While on supervision, you shall not possess a

3      firearm or other dangerous weapon.  Whether it was legal

4      before, you've now been convicted of a felony.

5                You shall not use or possess an illegal controlled

6      substance.  And you shall not commit another federal, state,

7      or local crime.  I'm going to waive the drug testing

8      requirements.

9                You shall also abide by the general conditions of

10     supervision adopted by the U.S. Probation Office as well as

11     the following special conditions:

12               There's a federal statute that, as required for

13     all felony offenses, you must submit to the collection and

14     use of DNA identification information either while

15     incarcerated or at the direction of the U.S. Probation

16     Office.

17               You are to pay the $2,000 of restitution at a

18     schedule to be determined by the Probation Office.

19               Given what I've been told by the many letter

20     writers, I believe you are capable of performing meaningful

21     community service, notwithstanding your challenges, and I

22     imagine that there are many housing-related or

23     environmental-related organizations or public parks that

24     could benefit from your talents at construction or

25     landscaping; therefore, I will order you to perform 200

1     hours of community service.  You'll be supervised and

2     verified by the Probation Office.  Attending regular church

3     functions or assisting your sons' athletic teams will not

4     count.

5                I -- also will be a condition of your supervised

6     release that you be assessed to see if there is a need for

7     any ongoing mental health treatment now.  Any records I had

8     were from quite some time ago and I don't know what, if

9     anything, is going on at this point.  If the assessment

10    recommends it, then you will participate in any treatment

11    that is indicated at the direction and under the supervision

12    of the Probation Office.

13               Also, given all of the circumstances, I don't

14    believe that you can be trusted to participate in

15    highly-charged activities such as political rallies.  So it

16    will be a condition that you remain within the State of

17    Washington and not travel out of state or to the state

18    capitol without the Court's advance permission.

19               The Probation Office is directed to release the

20    probation -- the presentence report in -- to all appropriate

21    agencies in order to exercise the sentence of the Court.

22    Any treatment agencies shall return the presentence report

23    to the Probation Office under the -- upon the defendant's

24    completion or termination from treatment.

25               Mr. Leffingwell, you will have the right to appeal

1    the sentence imposed by the Court if the period of

2    imprisonment is longer than the statutory maximum or if I

3    departed upward from the applicable sentencing guideline

4    range.  If you choose to appeal, you must file any appeal

5    within 14 days after I enter judgment which is -- which I've

6    already said I'm going to delay until after I hear from your

7    lawyer.  If you're unable to afford the costs of an appeal,

8    you may request permission from the Court to file an appeal

9    without costs to you.

10             Mr. Carroll, are there any other specific

11   recommendations that you want me to make?

12             MR. CARROLL:  Yes, Your Honor.  It's been my

13   experience that when -- if you've got a six-month

14   sentence -- if you have been -- let's say he had been in --

15   being held at D.C. Jail and you gave him six months.  They

16   would send him automatically to a halfway house.  And

17   ordinarily, the BOP would not take you unless you're getting

18   13 months.  I was going to ask of the Court if you -- if the

19   Court could ask the BOP to designate him to a halfway house

20   or community confinement there in Washington, and that would

21   take completely out of the question as to whether or not he

22   would lose his pension or not, because if it's community

23   confinement or a halfway house, you don't lose your pension.

24             THE COURT:  At this point, I don't know enough

25   about what the procedures are in that every District is

1       different.  D.C. has the unique federal facility in the city

2       that they use for shorter sentences.  I think in some of

3       these cases with the short sentence -- some Districts have

4       arrangements with local facilities, some don't, and I don't

5       have the information as to what they would do in this

6       particular instance in connection with this sentence.  So I

7       don't --

8                   MR. CARROLL:  I have a guy --

9                   THE COURT:  I --

10                  MR. CARROLL:  I have a guy in D.C. Jail right now

11      who just got a violation of supervised release and I think

12      it was 9 or 10 months that he got, and the BOP -- or the --

13      if I -- when I go on the website, they list him as in

14      transit.  Well, they're going to let him do his entire time

15      in D.C. Jail because it's less than a year.  And so I'm not

16      sure --

17                  THE COURT:  Right.  Well, I know that that happens

18      in D.C., and what I've discovered -- these -- the January

19      6th defendants have come from all over the country and there

20      are different arrangements between different Districts in

21      terms of where people go.  And right now, of course, we

22      don't even have a halfway house in D.C., and I don't think

23      you're advocating that --

24                  MR. CARROLL:  No, no, no, Your Honor.

25                  THE COURT:  -- come back here.  So I think we

 1    should -- I don't have a specific recommendation I can make

 2    to them.  I can try to find out more from the Probation

 3    Office, now that we know what the time of the sentence is,

 4    what the options are in his District, but I don't know what

 5    they are right now to make --

 6            MR. CARROLL:  That would be helpful.  If -- it's

 7    my understanding that all sentences go to Beaumont, Texas,

 8    and that's where all the sentences are calculated.  That's

 9    been my experience in the last couple years.  But if

10    Probation could find out, that would be very helpful.

11            THE COURT:  All right.  Well, I -- it may be in

12    Texas where they calculate it.  I'm -- I don't -- I think

13    sometimes they can find out where the sentences will be

14    served.  So if they get any information about that, I'll

15    have them share it with all of us.

16            Is there anything further on behalf of the United

17    States for me to take up right now?

18            MS. ROZZONI:  Your Honor, the only thing I'd note

19    is I believe you said he pled guilty to Count 1.  It was

20    actually Count 2.  And I just --

21            THE COURT:  Okay.

22            MS. ROZZONI:  -- want to make sure it's correct in

23    the judgment.

24            THE COURT:  You are correct about that and --

25    that's correct, and that's what the judgment and commitment

```
 1    order will state, as well.  So we have now to make a motion

 2    with respect to the other counts.

 3              MS. ROZZONI:  Yes, Your Honor.  Presuming the

 4    judgment is entered as you have explained, the United States

 5    would dismiss the remaining counts of the indictment.

 6              THE COURT:  All right.  And that would be 1, 3 --

 7    the rest of them?

 8              MS. ROZZONI:  Yes, Your Honor.

 9              THE COURT:  Yes.  Yes.

10              Mr. Haley, you're looking at --

11              All right.  No, I'm not going to -- I'm going to

12    waive any interest on the restitution.

13              MR. CARROLL:  Thank you, Your Honor.

14              THE COURT:  All right.  I, you know -- I think

15    this was a difficult sentencing hearing for everyone

16    involved, and I appreciate the compassion you've shown your

17    client, Mr. Carroll, and the quality of the advocacy on

18    behalf of everyone today.  Thank you.

19              MR. CARROLL:  Thank you, Your Honor.  Have a nice

20    weekend.

21              MR. PEARCE:  Thank you, Your Honor.

22              MS. ROZZONI:  Thank you.

23              THE DEFENDANT:  Thank you, Your Honor.

24              THE COURT:  All right.  Take care,

25    Mr. Leffingwell.
```

1    THE DEPUTY CLERK:  This Honorable Court --

2    THE DEFENDANT:  Thank you.

3    THE DEPUTY CLERK:  -- now stands in --

4    THE DEFENDANT:  You, too.

5    THE DEPUTY CLERK:  -- recess until return of

6  Court.

7    (Proceedings concluded at 3:47 p.m.)

8                    * * * * * * * * * * *

9            CERTIFICATE OF OFFICIAL COURT REPORTER

10     I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

11  certify that the above and foregoing constitutes a true and

12  accurate transcript of my stenographic notes and is a full,

13  true and complete transcript of the proceedings to the best

14  of my ability, dated this 5th day of April 2022.

15     Please note:  This hearing occurred during the COVID-19

16  pandemic and is, therefore, subject to the technological

17  limitations of court reporting remotely.

18                         /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
19                         United States Courthouse
                           Room 6722
20                         333 Constitution Avenue, NW
                           Washington, DC 20001

21

22

23

24

25